UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:  

It'Sugar FL I LLC, *et al.,*

      Debtors.

_____/

Case No. 20-20259-RAM
(Jointly Administered)

Chapter 11

**DECLARATION OF THE DEBTORS' CHIEF
RESTRUCTURING OFFICER IN SUPPORT OF FIRST DAY MOTIONS**

I, Troy Taylor, declare under penalty of perjury of the laws of the United States of America that the following is true to the best of my knowledge, information and belief:

1. I am the proposed Chief Restructuring Officer ("***CRO***") of It'Sugar FL I LLC, It'Sugar LLC, It'Sugar Atlantic City LLC and It'Sugar FLGC LLC (collectively, "***It'Sugar***" or the "***Debtors***"). Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees or advisors, or my opinion based upon my experience with the Debtors' operations and financial condition.

2. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents or my personal opinion.

3. I am authorized to submit this Declaration on behalf of the Debtors.

4. On September 22, 2020 ("***Petition Date***"), the Debtors commenced these Chapter 11 cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("***Bankruptcy Code***").

5. The Debtors intend to operate their business and manage their assets as debtors-in-possession pursuant to 11 U.S.C. § 1107(a) and 1108.

6. To minimize any business disruption caused by the commencement of these Chapter 11 cases and to ensure a smooth transition into Chapter 11, the Debtors seek various types of relief through "first day" applications and motions filed contemporaneously herewith, including, but not limited to:

    a. Emergency Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing from SHL Holdings, Inc.; and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling Final Hearing; and (V) Granting Related Relief ("***DIP Financing Motion***")

    b. Debtors' Emergency Motion for Authorization to (I) Pay Certain Prepetition Employee Obligations and Maintain and Continue Employee Benefits and Programs; and (II) for Banks and other Financial Institutions to Honor and Process Checks and to Honor Transfers Related to Such Obligations ("***Wage Motion***");

    c. Debtors' Emergency Motion for Authorization to (I) Continue Their Insurance Programs; and (II) Pay All Insurance Obligations ("***Insurance Motion***");

    d. Debtors' Emergency Motion Pursuant to Sections 105(a), 363(b), and 503(b)(1) of the Bankruptcy Code for Authorization to Honor Certain Prepetition Customer Programs ("***Customer Programs Motion***");

    e. Debtors' Emergency Motion for (A) Authority to (I) Maintain Certain Bank Accounts and Continue to Use Existing Business Forms and Checks, and (II)

        Continue to Use Existing Cash Management System, and (B) Waiver of Certain Investment and Deposit Guidelines ("**Cash Management Motion**"); and

    f. First Omnibus Motion to Reject Unexpired Leases ("**Lease Rejection Motion**" and together with the DIP Financing Motion, the Wage Motion, the Insurance Motion, the Customer Programs Motion, and the Cash Management Motion, the "**First Day Motions**").

## Background & Reasons for Filing Chapter 11

7. The Debtors operate as a single business and are known throughout the retail industry as It'Sugar. It'Sugar is a specialty candy retailer whose products include bulk candy, candy in giant packaging, and licensed and novelty items.

8. It'Sugar operates approximately 100 retail stores across the country. In connection with the COVID-19 pandemic, in March 2020, It'Sugar was forced to close all retail locations and furlough all store employees, along with a majority of corporate employees. Over the next several months, It'Sugar reopened approximately 90 retail locations and began recalling furloughed employees, but regularly had to close individual locations due to staffing shortages and local government mandates. It'Sugar's sales declined during the second quarter of 2020 by approximately 48% compared with 2019. There is no assurance that sales will improve or will not continue to decline, as the duration and severity of the COVID-19 pandemic and its effects remain uncertain. As a result of the closure of its stores and decreased sales, It'Sugar ceased paying rent to landlords in April 2020. While negotiations with landlords have been ongoing, a number of It'Sugar's leases are no longer market value and It'Sugar has accrued unpaid rent obligations exceeding $7.5 million, thus necessitating bankruptcy in order to reject certain leases and restructure It'Sugar's corresponding debt.

**The DIP Financing Motion**[1]

9.  Pursuant to the DIP Financing Motion, the Debtors seek entry of an Interim Order, and subsequently a Final Order, authorizing the Debtors to obtain secured post-petition financing from SHL Holdings, Inc. ("**SHL**") in the form of one or more loans in the maximum amount of $4,000,000 ("**DIP Financing**") to be used to pay those obligations of the Debtors set forth in the Budget attached to the DIP Financing Motion, including postpetition obligations and any critical vendor payments as ordered by the Court.

10. SHL is an affiliate of the Debtors. More specifically, BBX Capital Corp. wholly owns BBX Capital Florida LLC which owns BBX Sweet Holdings LLC which owns It'Sugar Holdings LLC, which owns 90% of It'Sugar LLC. It'Sugar LLC owns the other three Debtors.

11. Jeffrey Rubin is the founder and Chief Executive Officer and owns JR Sugar Holdings Inc. which owns the other 10% of It'Sugar LLC. Mr. Rubin is a Manager for all of the Debtors.

12. SHL is the owner and holder of the Debtors' prepetition secured debt, which it acquired from Bank of America in April 2020. The secured debt owed to SHL is the Debtors' primary prepetition secured debt. There may also be certain construction liens and governmental unit personal property tax liens.

13. The terms of the DIP Financing are appropriate, reasonable, and in the Debtors' business judgment essential to enable it to continue operating during the initial stages of this Chapter 11 case. SHL is only charging interest at rate of monthly Libor + 1.5% and is not requiring any payments be made under the DIP Financing, whether for principal or interest, until maturity. In addition, SHL is not seeking to prime any pre-petition secured creditor, but rather is seeking (i)

---

[1] Capitalized terms shall have the meaning ascribed to them in the First Day Motions unless otherwise defined.

4

first liens on any of the Debtors' assets that are not subject to any perfected pre-petition lien, (ii) junior liens on any of the Debtors' assets that are subject to any perfected pre-petition lien, and (iii) a super-priority administrative expense claim, in each case pursuant to Section 364(c) of the Bankruptcy Code.

14. The DIP Financing is the only alternative readily available that can satisfy the Debtors' financing needs in this case and permit it to pursue a restructuring within chapter 11. The Debtors conducted arm's length negotiations with SHL regarding the terms of the DIP Financing. The Debtors must have immediate access to loan proceeds to pay employees, meet overhead costs, and make all other payments set forth in the Budget that are essential for the continued management, operation and preservation of the Debtors' business and assets. The ability to satisfy these obligations as and when due is essential to the Debtors' continued operation of its business during these Chapter 11 cases. The immediate access to the DIP Financing, along with the use of Cash Collateral, to provide adequate liquidity for the operation and maintenance of the Debtors' estates and assets will benefit all stakeholders by facilitating the Debtors' efforts to preserve and enhance the value of the Debtors' assets.

15. Given the impact of the COVID-19 pandemic on the retail industry, after discussions with three potential DIP loan lenders, I do not believe that any other lender would entertain a DIP loan to the Debtors on comparable or better terms.

16. As a result, I believe that the DIP Financing is necessary to avoid immediate and irreparable harm to the Debtors and their bankruptcy estates. In my business judgment, the DIP Financing represents the best possible opportunity for the Debtors to retain the chance to maintain operations and pursue the Debtors' restructuring goals. Accordingly, the funds provided by the DIP Financing are required to avoid a detrimental impact on the Debtors' operations, and to enable

the Debtors to effect a preservation of the value of the Debtors' assets, all of which is clearly in the best interests of the Debtors' estates, creditors and other parties in interest.

### The Wage Motion

17.     The Debtors request approval to pay and/or honor the Prepetition Employment Obligations to Employees, which include non-insiders and insiders. The Employees provide essential services to the Debtors, and their skills and understanding of the Debtors' operations and infrastructure are essential to the operation of It'Sugar. Payment to the Employees on account of already accrued and unpaid wages is necessary to minimize the risk that the Employees will find other employment and to preserve Employee morale and productivity and continuous service to customers.

18.     The insiders described in the Wage Motion are legitimate employees, working full-time or part-time for the Debtors and are absolutely essential to the Debtors' business operation. If the Debtors were required to replace these employees, the Debtors' business operations would be severely disrupted and prejudiced. Further, replacement of these employees could not likely be done at any cost savings to the Debtors. Indeed, the cost of replacing these employees would likely exceed the current amount being paid to such employees.

### The Insurance Motion

19.     Maintaining insurance coverage is critical to the Debtors' operation and reorganization, and is required by the U.S. Trustee Guidelines. The Debtors cannot operate their business without the Insurance Policies and any interruption in the Debtors' insurance coverage would have a substantially adverse impact upon the Debtors' ability to maintain business operations and mitigate liabilities. The Debtors require the relief requested in order to fulfill their

payment obligations for the benefit of the estates, and all parties in interest, and in order to comply with applicable law and the U.S. Trustee Guidelines.

### The Customer Programs Motion

20. The Debtors seek approval to continue their Customer Programs in the ordinary course of business and to honor approximately $200,000 of their prepetition obligations thereunder.

21. The benefits of the Customer Programs are integral to the Debtors' efforts to stabilize their business, restore vitality, and ultimately deliver the most value to all stakeholders in these chapter 11 cases. The Debtors believe they must quickly assure Customers of the Debtors' continued ability to fulfill their obligations under the prepetition Customer Programs in order to maintain their valuable customer relationships following the commencement of these chapter 11 cases.

22. The continuity, viability, and revitalization of the Debtors' business is dependent on the development and maintenance of the loyalty of their Customers. It is essential that the Debtors be permitted to continue the Customer Programs and honor their prepetition obligations thereunder. If the Debtors are unable to do so, their operations will be irreparably harmed.

23. The Customer Programs are standard practice in the specialty retail industry. The Debtors' principal competitors maintain programs similar, if not identical, to those offered by the Debtors. As such, Customers have come to expect these types of programs to be offered in the ordinary course of business by all participants in the Debtors' industry, including the Debtors.

24. The Debtors' ability to continue the Customer Programs, which have proven beneficial, is necessary to reassure Customers and preserve goodwill. I believe that the resulting benefit of continued Customer satisfaction and loyalty during the pendency of these cases will

exceed the cost of such programs. Considering the potential for loss of competitiveness and the resulting impact on the Debtors' business, I believe that continuing the Customer Programs in the ordinary course of business and performing and honoring the Debtors' prepetition obligations thereunder is in the best interest of the Debtors, their estates, and their creditors.

## **The Cash Management Motion**

25.    The Debtors seek approval for the continued use of certain existing Bank Accounts, the continued use of existing business forms and checks, the continued use of the existing cash management system, and waiver of the investment and deposit guidelines of Section 345 of the Bankruptcy Code and the U.S. Trustee's Guidelines.

26.    Prior to the commencement of these Chapter 11 cases, in the ordinary course of their business, the Debtors utilized the Bank Accounts nationwide.

27.    It'Sugar LLC receives invoices for all lease payments, utilities, vendors and trade debt for all Debtors.

28.    Every Monday and Thursday, It'Sugar LLC manually sweeps the Store Deposit Accounts. The sweep is electronically transferred into the Prepetition Operating Account.

29.    The Bank Accounts are part of a carefully constructed and highly automated cash management system that the Debtors have employed, in the ordinary course of their business, to ensure the Debtors' ability to efficiently monitor and control their cash position, effectively and efficiently operate their business and ensure payment of their employees, vendors, and other obligations.

30.    The Cash Management System allows the Debtors to operate their business in the most efficient and effective manner. Through the utilization of this existing Cash Management System, the Debtors are able to facilitate cash forecasting and reporting, monitor collection and

disbursement of funds, and maintain control over the administration of the various bank accounts required to effect the collection, disbursement, and movement of cash, as well as the payment of the Debtors' employees. Indeed, the Cash Management System used by the Debtors constitute ordinary, usual, and essential business practice. This integrated system allows the Debtors to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, (c) ensure prompt and efficient payment of employees, and (d) reduce administrative expenses.

31. The Debtors' operations require that the Cash Management System continue during the pendency of their Chapter 11 cases. If the Debtors were required to adopt a new cash management system, their operations and payments to their employees and vendors would be severely disrupted, which would undoubtedly interfere with the Debtors' business and have a serious and potentially devastating impact on the Debtors' ability to reorganize. Further, the establishment of new cash accounts and a new collection and disbursement system would interfere with the Debtors' business relationships and could result in substantial additional costs to the Debtors' bankruptcy estates. In contrast, maintenance of the existing Cash Management System will avoid this disruption and, thereby, avoid unnecessarily distracting the Debtors from more critical matters. Accordingly, I believe that maintenance of the existing Cash Management System is essential and in the best interests of all creditors and other parties in interest.

32. I also believe that opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. With the use of computer technology, it is now easy to differentiate between pre- and post-petition transactions by date. The Debtors, in the ordinary course of their business, use many checks, invoices, receipts, stationery, and other business forms. In light of the nature and scope of the business in which the Debtors are engaged, the numerous other parties with whom

the Debtors deal, the Debtors need to use their existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition payroll and other vendors and suppliers to the Debtors' business, which could have a catastrophic impact on the Debtors' operations.

33. I also believe that changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtors' estate and disruptive to the Debtors' business operation.

34. Without the relief requested in the Cash Management Motion, I believe the Debtors' business operation as a whole will suffer significant and possibly irreversible adverse consequences. Any disruption of the Debtors' ability to pay their vendors and suppliers, as well as their employees, could adversely affect the Debtors' ability to maintain their operations at their current level or to advance a restructuring of the Debtors that will maximize value for all constituents.

### The Lease Rejection Motion

35. The Debtors seek approval to reject the Leases, because the Debtors intend to close the stores located as the premises covered by the Leases.

36. I believe that the Leases are above market, and as a result, I do not believe that any of the Leases have any value that can be achieved through an assumption and assignment to a third party.

37. I also believe that maintaining the leases would impose unnecessary costs and burdens on the Debtors' estates, and that it is in the best interest of the Debtors and their estates

that the Leases be rejected as they are burdensome and unnecessary to the Debtors and their operations.

[Remainder of page intentionally left blank. Next page is signature page.]

Pursuant to Section 1746, Title 28, of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 22, 2020.

_____
Troy Taylor
Proposed Chief Restructuring Officer

on 1746, Title 28, of the United States Code, I declare under penalty of

g is true and correct.

r 22, 2020

_____
Troy Taylor
Proposed Chief Restructuring Officer