UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

It'Sugar FL I LLC, *et al.*,

      Debtors.

_____/

Case No. 20-20259-RAM
(Jointly Administered)

Chapter 11

**NOTICE OF FILING OF (1) EXECUTED DIP DOCUMENTS,
(2) BLACKLINE VERSION OF DIP DOCUMENTS, AND (3) MODIFIED BUDGET**

PLEASE TAKE NOTICE THAT on October 22, 2020, in connection with the Court's *Interim Order (I) Authorizing Debtors (A) To Obtain Postpetition Financing From SHL Holdings, Inc.; And (B) To Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Modifying The Automatic Stay, (IV) Scheduling Final Hearing; And (V) Granting Related Relief Nunc Pro Tunc To September 22, 2020* (the "***Interim Order***") [ECF No. 72][1] It'Sugar FL I LLC, It'Sugar LLC, It'Sugar Atlantic City LLC, and It'Sugar FLGC LLC, executed the DIP Documents attached as Exhibit A.

PLEASE TAKE FURTHER NOTICE THAT a blackline version showing the proposed changes made to the DIP Documents is attached as Exhibit B.

PLEASE TAKE FURTHER NOTICE THAT a revised 13 week cash collateral budget and comparison of 13 week budget for consideration at the Final Hearing is attached as Exhibit C.

---

[1] All other capitalized terms not defined herein shall have the meanings ascribed to them in the Interim Order.

1

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on October 22, 2020, via the Court's Notice of Electronic Filing on those parties listed on the attached **Exhibit 1**.

 s/ Joshua W. Dobin
Michael S. Budwick, Esquire
Florida Bar No. 938777
mbudwick@melandbudwick.com
Joshua W. Dobin, Esquire
Florida Bar No. 93696
jdobin@melandbudwick.com
James C. Moon, Esquire
Florida Bar No. 938211
jmoon@melandbudwick.com
MELAND BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

*Attorneys for Debtors*

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Joaquin J Alemany**    joaquin.alemany@hklaw.com, jose.casal@hklaw.com
- **Scott Andron**    sandron@broward.org, swulfekuhle@broward.org
- **Joseph H Baldiga**    bankrupt@mirickoconnell.com
- **Brian S Behar**    bsb@bgglaw.net
- **David M Blau**    dblau@clarkhill.com
- **Michael S Budwick**    mbudwick@melandbudwick.com, ltannenbaum@melandbudwick.com;mrbnefs@yahoo.com;mbudwick@ecf.courtdrive.com;ltannenbaum@ecf.courtdrive.com;phornia@ecf.courtdrive.com
- **David S Catuogno**    david.catuogno@klgates.com, caitlin.conklin@klgates.com
- **Andrew S Conway**    aconway@taubman.com
- **Robert W Davis**    robert.davis@hklaw.com, tonya.berger@hklaw.com
- **Ryan E Davis**    rdavis@whww.com, thiggens@whww.com;thiggens@ecf.courtdrive.com
- **Joshua W Dobin**    jdobin@melandbudwick.com, ltannenbaum@melandbudwick.com;mrbnefs@yahoo.com;ltannenbaum@ecf.courtdrive.com;jdobin@ecf.courtdrive.com;ltannenbaum@ecf.courtdrive.com;phornia@ecf.courtdrive.com
- **Daniel M Eliades**    Daniel.eliades@klgates.com, caitlin.conklin@klgates.com
- **Kate Foley**    kfoley@mirickoconnell.com
- **Robert C Furr**    ltitus@furrcohen.com, atty_furrcohen@bluestylus.com;cworkinger@furrcohen.com;staff1@furrcohen.com
- **Daniel Gielchinsky**    dan@dyglaw.com
- **Ronald E Gold**    rgold@fbtlaw.com, eseverini@fbtlaw.com;khardison@fbtlaw.com
- **Eric S. Golden**    egolden@burr.com, jmorgan@burr.com
- **Robert L LeHane**    kdwbankruptcydepartment@kelleydrye.com
- **Ilan Markus**    imarkus@barclaydamon.com, docketing@barclaydamon.com
- **Orfelia M Mayor**    ombankruptcy@mayorbankruptcy.com, legalservices@pbctax.com;mayor.orfeliar100728@notify.bestcase.com
- **James C. Moon**    jmoon@melandbudwick.com, ltannenbaum@melandbudwick.com;mrbnefs@yahoo.com;jmoon@ecf.courtdrive.com;ltannenbaum@ecf.courtdrive.com;phornia@ecf.courtdrive.com
- **Kevin S Neiman**    kevin@ksnpc.com
- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov
- **Chad S Paiva**    trustee.paiva@gmail.com, michaelbollingpa@gmail.com,sramirez.fbp@gmail.com
- **Kristen N Pate**    bk@brookfieldpropertiesretail.com
- **Michael S Provenzale**    michael.provenzale@lowndes-law.com, anne.fisher@lowndes-law.com
- **Grace E. Robson**    grobson@mrthlaw.com, mrthbkc@gmail.com,lgener@mrthlaw.com,grobson@ecf.courtdrive.com

- **Steven D Schneiderman**    Steven.D.Schneiderman@usdoj.gov
- **Eric J Silver**    esilver@stearnsweaver.com,
  rross@stearnsweaver.com;larrazola@stearnsweaver.com;cgraver@stearnsweaver.com;m
  fernandez@stearnsweaver.com;Atty_arrazola@bluestylus.com
- **Louis G Spencer**    louis@alexanderricks.com, dana@alexanderricks.com
- **Ronald M Tucker**    rtucker@simon.com,
  cmartin@simon.com;bankruptcy@simon.com
- **Gillian D Williston**    gillian.williston@troutman.com,
  fslecfintake@troutman.com;ethan.ostroff@troutman.com;richard.hagerty@troutman.com
  ;carter.nichols@troutman.com

## LOAN AND SECURITY AGREEMENT

LOAN AND SECURITY AGREEMENT (this "Amendment"), dated as of October __, 2020, by and among IT'SUGAR LLC, a Delaware limited liability company ("IT'Sugar"), IT'SUGAR ATLANTIC CITY LLC, a Delaware limited liability company ("Atlantic City"), IT'SUGAR FLGC LLC, a Florida limited liability company ("FLGC," and collectively with IT'Sugar and Atlantic City, the "Prepetition Obligors"), IT'SUGAR FL I, LLC, a Delaware limited liability company ("FLI" and collectively with the Prepetition Obligors, the "Debtors") and SHL HOLDINGS, INC., a Florida corporation ("SHL").

R E C I T A L S:

A.      It'Sugar was indebted to Bank of America N.A. ("Bank") as evidenced by that certain Credit Agreement dated August 24, 2018, and First Amendment thereto dated February 28, 2020, by and between It'Sugar and Bank (as so amended, the "Prepetition Credit Agreement"), evidencing a revolving line of credit in the principal amount of $4,000,000.00 (the "Prepetition Line of Credit"), which could be increased to $6,000,000.00 upon the request of It'Sugar.

B.      It'Sugar's obligations under the Prepetition Line of Credit were guaranteed by Atlantic City and FLGC pursuant to the terms of that certain Continuing and Unconditional Guaranty dated August 24, 2018, made by Atlantic City and FLGC in favor of the Bank (the "Guaranty").

C.      The Prepetition Obligors' respective obligations under the Credit Agreement and Guaranty are secured by, among other things, that certain Security Agreement dated August 24, 2018, by and among the Prepetition Obligors and the Bank (the "Prepetition Security Agreement"), granting the Bank a security interest in the personal property assets of the Prepetition Obligors described therein. The Bank's security interest was perfected pursuant to UCC-1 Financing Statements filed (i) with respect to It'Sugar and Atlantic City, with the Delaware Department of State on August 24, 2018 under filing #20185865726, and (ii) with respect to FLGC, with the Florida Secured Transactions Registry on August 24, 2018 under filing #201806304765 (the "LOC UCC-1s").

D.      It'Sugar was also indebted to Banc of America Leasing & Capital, LLC (also, "Bank") as evidenced by that certain Master Loan and Security Agreement No. 45868-70000 dated September 6, 2018, by and between It'Sugar and Bank (the "Prepetition Equipment Loan Agreement"), and that certain Equipment Security Note Number 001 dated September 6, 2018 (the "Prepetition Equipment Note"), executed by It'Sugar and the Bank, and evidencing indebtedness in the original principal amount of $620,074.91 (the "Prepetition Equipment Loan").

E.      It'Sugar's respective obligations under the Prepetition Equipment Loan are secured by the Prepetition Equipment Loan Agreement and the Prepetition Equipment Note, granting the Bank a security interest in certain Equipment (as described and defined in the Prepetition Equipment Loan Agreement and Prepetition Equipment Note). The Bank's security interest was perfected pursuant to a UCC-1 Financing Statement filed with respect to It'Sugar,

EXHIBIT A

with the Delaware Department of State on September 19, 2018 under filing #20186460741 (the "Equipment UCC-1").

F.      The Prepetition Credit Agreement, the Guaranty, the Prepetition Security Agreement, the LOC UCC-1s and all other written documents executed in connection with the Prepetition Line of Credit, as well as the Prepetition Equipment Loan Agreement, the Prepetition Equipment Note, the Equipment UCC-1, and all other written documents executed in connection with the Prepetition Equipment Loan, together with any and all written renewals, modifications and/or extensions thereof are collectively referred to as the "Prepetition Loan Documents".

G.      The Bank's rights under the Prepetition Loan Documents were assigned without recourse to the SHL pursuant to two Loan Sale and Assignment Agreements, dated April 7, 2020, and the other assignment documents and instruments executed in connection with the Assignment, and by reason thereof SHL is now the holder of such Prepetition Loan Documents and has all the rights and obligations of the Bank thereunder.

H.      The Prepetition Credit Agreement has been amended from time to time, including an increase of the principal balance advanced on the Prepetition Line of Credit to $6,000,000.00.

I.      As of the Petition Date, the Prepetition Obligors, as applicable, are liable for payment of the Prepetition Debt (defined below) in an amount not less than $6,216,362.00.

J.      On September 22, 2020, each of the Prepetition Obligors, along with the their affiliate IT'Sugar FL I, LLC ("FL I," collectively with the Prepetition Obligors, the "Debtors") filed petitions for relief under Chapter 11of the Bankruptcy Code in the United States Bankruptcy Court, Southern District of Florida (the "Bankruptcy Court") styled as follows: (1) *In re IT'Sugar FI I, LLC*, Case No. 20-20259-RAM (2) IT'Sugar, LLC, Case No. 20-20261-RAM, (3) IT'Sugar Atlantic City, LLC, Case No. 20-20263-RAM and (4) IT'Sugar FLGC, LLC, Case No. 20-20264-RAM (collectively, the "Bankruptcy Cases").

K.      The Debtors have requested that SHL extend financing to the Debtors in connection with the Bankruptcy Cases to facilitate its reorganization.

L.      SHL is willing to make loans and extend credit to the Debtors, subject to the terms and conditions set out herein and subject to the terms and conditions set forth in the Financing Order and any other orders of the Bankruptcy Court approving the proposed financing by SHL.

M.      The parties desire to enter into this Agreement and to memorialize their agreements with respect to the matters set forth.

<u>A G R E E M E N T</u>:

FOR AND IN CONSIDERATION of the mutual covenants herein and good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtors and SHL agree as follows:

1.    <u>Recitals</u>.  The foregoing recitals are confirmed by the parties as true and correct and are incorporated herein by reference. The recitals are a substantive part of this Agreement. Specifically, the Debtors acknowledge the Prepetition Debt.

2.    <u>Definitions</u>. Unless the context otherwise requires, the following terms when used in this Agreement will have the meanings set forth below:

"Administrative Expense Advance" means the portion of the Advances for the payment of (i) fees and expenses incurred by professionals retained by Debtors and the Committee (if any), all up to the amount set forth in the Budget; (ii) fees due to the United States Trustee pursuant to 28 U.S.C. Section 1930(a)(6); and (iii) fees due the Clerk of the Court.

"Administrative Expense Carve Out" means the carve out from SHL's super-priority administrative expense claim in order to allow the Administrative Expense Advance to be used as set forth in the Budget.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Budget" means Debtors' budget attached as "**<u>Exhibit A</u>**".

"Business Day" means any day excluding Saturday, Sunday, and any day which is a legal holiday under the laws of the State of Florida or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

"Collateral" means the following property now owned or hereafter acquired by the Debtors:

(a)  All accounts, and all chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto; and all returned or repossessed goods which, on sale or lease, resulted in an account.

(b)  All inventory.

(c)  All equipment and fixtures now owned or hereafter acquired by the Debtors.

(d)  All of the Debtors' deposit accounts wherever located. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

(e)  All instruments, chattel paper, documents, certificates of deposit, securities and investment property of every type.

(f)  All general intangibles. The Collateral shall include all good will connected with or symbolized by any of such general intangibles.

(g)  All negotiable and nonnegotiable documents of title covering any Collateral.

(h) All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(i) All substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the Collateral, and all income, benefits and property receivable on account of the Collateral, and all supporting obligations covering any Collateral.

(j) All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer readable memory and any computer software necessary to process such memory.

"Committee" means any creditors or equity security holders committee appointed in any Chapter 11 case by the U.S. Trustee.

"Debt" means, as of any applicable date of determination and as to any Person, all items of indebtedness, obligation, or liability of such Person, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, that should be classified and presented as a liability on a balance sheet prepared in accordance with GAAP, including without limitation any billings in excess of costs and estimated earnings on Work that has not been completed.

"Event of Default" means any one or more of the following occurring after the date of this Agreement that is determined by SHL to constitute an Event of Default on or after its occurrence:

(a) Debtors have failed or refused to comply with any provisions of the Financing Order or have failed or refused to perform any obligation under this Agreement; or

(b) the occurrence of a default under any document relating to any Debt of Debtors; or the foreclosure or notice of foreclosure by any lender or holder of any Debt of Debtors on any collateral that secures any Debt of Debtors; or

(c) Debtors allow a judgment creditor to obtain possession of any of the Collateral by any means, including, but without limitation, levy, distraint, replevin, or self-help; or

(d) if Debtors violate, breach, or fail to adhere to any of the terms, conditions, or covenants of any of the Loan Documents or the Prepetition Loan Documents; or

(e) if the Bankruptcy Cases are dismissed, suspended, or converted to cases under Chapter 7 of the Bankruptcy Code or a trustee will be appointed in the Bankruptcy Cases; or an application will be filed by Debtors for the approval of, or there will arise, any other claim not contemplated by this Agreement having priority senior to or pari passu with the claims of SHL under this

Agreement or any other claim having priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code; or

(f) if the Bankruptcy Court enters an order (granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder (other than SHL) of any security interest in the Collateral; or

(g) any Person (including any Committee) will successfully prosecute any action, suit, or other proceeding or contested matter challenging the validity, perfection, or priority of any Liens of SHL, or the validity or enforceable of any of the Loan Documents or the Prepetition Loan Documents, or asserting any avoidance claims against SHL or seeking to recover any monetary damages from SHL; or

(h) the determination of Debtors, whether by vote of its managers, members, or otherwise, to suspend the operation of Debtors' business in the ordinary course, liquidate all or substantially all of Debtors' assets, or the filing of a motion or other application in the Bankruptcy Cases, seeking authority to do any of the foregoing; and

(i) this Agreement or any related document will be terminated, revoked, or declared void or unenforceable or challenged by Debtors.

Notwithstanding anything in the Prepetition Loan Documents to the contrary, no Event of Default will be deemed to have occurred as a result of the filing of the Bankruptcy Cases.

"Financing Order" means an interim order and/or a financing order that is entered by the Bankruptcy Court, following proper notice and a hearing thereon, which is in all respects satisfactory to SHL and which, among other things, authorizes the incurrence by Debtors of post-petition secured and super administrative priority Debt as contemplated by this Agreement and affords adequate protection of Liens in favor of SHL.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board.

"Laws" means all ordinances, statutes, rules, regulations, orders, injunctions, writs, or decrees of any government or political subdivision or agency thereof, or any court or similar entity established by any thereof.

"LIBOR Daily Floating Rate" is a fluctuating rate of interest which can change on each Banking Day. The rate will be adjusted on each Banking Day to equal the London Interbank Offered Rate (or a comparable or successor rate which is approved by SHL) for U.S. Dollar deposits for delivery on the date in question for a one month term beginning on that date. SHL will use the London Interbank Offered Rate as published by Bloomberg (or other commercially available

source providing quotations of such rate as selected by the SHL from time to time) as determined at approximately 11:00 a.m. London time two (2) London Banking Days prior to the date in question, as adjusted from time to time in the SHL's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate will be determined by such alternate method as reasonably selected by SHL. A "Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars. If at any time the LIBOR Daily Floating Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Lien" means any mortgage, security interest, lien, pledge, charge, proxy, voting trust or arrangement, encumbrance, lease, sublease, license, or other rights of use by another or other interest of any character whatsoever.

"Loan Documents" means this Agreement, the promissory note, and any other instruments, agreements or other documents entered into in connection herewith

"Material Adverse Effect" means, relative to any occurrence of whatever nature (including the adverse determination in any litigation, arbitration, or governmental investigation or proceeding), (i) a material adverse effect on the financial condition, business, or business operations of Debtors taken as a whole, or (ii) a material impairment of the ability of Debtors to satisfy its obligations to SHL under the Loan Documents or the Prepetition Loan Documents, or (iii) a material adverse impact on SHL's security interest in the Collateral.

"Obligations" means and includes the punctual payment and performance of parties' obligations under this Agreement and the other Loan Documents, and all loans, advances (including, without limitation, interest payments to prior secured parties, mortgagees, or lienors, or for Taxes, levies, insurance, rent, repairs to, or maintenance or storage of any of the Collateral (provided, however, nothing herein will be construed as a requirement or commitment that SHL will make any advances).

"Permitted Liens" means: (a) Liens of governmental agencies for taxes, assessments, or governmental charges not yet past due or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP; (b) inchoate non perfected mechanics', workmen's, and repairmen's Liens or other like Liens arising by operation of law in the ordinary course of business of Debtor and not past due unless contested in good faith by appropriate proceedings; and (c) Liens on individual specific pieces of equipment that are evidenced by UCC financing statements validly perfected prior to the Petition Date.

"Person" means any entity, whether an individual, trustee, corporation, partner, joint stock company, unincorporated organization, business association or firm, joint venture, a government or any agent or instrumentality or political subdivision thereof.

"Petition Date" means September 22, 2020 (the date on which Debtors filed for bankruptcy pursuant to the Bankruptcy Code).

"Prepetition Debt" means (a) All indebtedness or obligations under the Prepetition Loan Documents as of the Petition Date, including all "Indebtedness" (as defined in the Prepetition

Security Agreement), and "Obligations" (as defined in the Prepetition Equipment Loan Agreement) and all fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Loan Documents, plus (b) all amounts allowable under Section 506(b) of the Bankruptcy Code.

"Prepetition Liens" means SHL's asserted security interests in the Collateral under the Prepetition Loan Documents.

"Proceeds" means whatever is receivable or received when Collateral or proceeds are sold, collected, exchanged, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including returned or rebate of premiums, with respect to any insurance relating thereto.

"Records" means correspondence, memoranda, tapes, books, discs, paper, magnetic storage, and other documents or information of any type, whether expressed in ordinary or machine language.

"Replacement Liens" means SHL's Liens in the Collateral granted pursuant to the Financing Order.

"Tax" means any present or future tax, levy, impost, duty, charge, fee, deduction, or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld, or assessed.

"UCC" means the Uniform Commercial Code as in effect on the date hereof in the State of Florida as it may be amended from time-to-time; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection or priority of a security interest in any Collateral is governed by any state other than Florida, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

3.    <u>DIP Facility</u>. Subject to the terms and conditions of this Agreement and the Financing Order (including SHL's right to cease making loans to the Debtors), and subject to the satisfaction of the conditions precedent contained in this Agreement and the Financing Order, SHL agrees to make loans and advances (each, an "<u>Advance</u>" and collectively, the "<u>Advances</u>") to or on behalf of Debtors in the aggregate principal amount of four million dollars ($4,000,000.00) to the extent required to pay, when due, those expenses enumerated in the Budget. Debtors will execute a promissory note to evidence the advances and loans to be made under this Agreement. Said loans and advances will be repaid to SHL as set forth in this Agreement and in the promissory note. So long as there exists no Event of Default and subject to the terms of this Agreement the Advances shall be made to the Debtors, as appropriate, in the amounts and in accordance with the schedule set forth in the Budget. Interest shall accrue on the outstanding principal amount of each Advance at a rate per annum equal to LIBOR Daily Floating Rate plus one and one-half percent (1.50%).  Upon the occurrence of any Event of Default, interest on all amounts not paid when due shall accrue and be payable at a rate per annum equal to the highest rate permitted by applicable law. Any imposition of default interest shall be made retroactive to the date of the occurrence of the applicable Event of Default. All

interest on the Advances will be computed on the basis of the actual number of days elapsed over a 360-day year.

4.    <u>Superpriority Administrative Expense Claim</u>. Advances occurring from and after the Petition Date will constitute a super priority administrative expense in accordance with Sections 507(a)(1) and 503(b) of the Bankruptcy Code, which will have priority and payment over all other administrative expenses and unsecured claims of any kind or nature, whether now or hereafter arising including all administrative expenses of the kind specified in or arising or ordered under Sections 105, 326, 328, 503(b), 506(e), 507 (b), 546(c), and 1114 of the Bankruptcy Code. Notwithstanding the foregoing, the super priority administrative expense claims of SHL will be subordinate to the Administrative Expense Carve Out. Debtors will not incur, create, assume, suffer to exist or permit or make any application or motion for any other super priority claim or Lien which is pari passu with or senior to the claims of SHL under the Loan Documents, other than as expressly contemplated and permitted under this Agreement.

5.    <u>Security Interest</u>. As security for the payment and performance of all Obligations, now existing or hereafter incurred, matured or unmatured, direct or contingent, including all extensions and renewals thereof, Debtors, jointly and severally, hereby assign to SHL and grants to SHL a Lien upon and security interest in the Collateral. The Collateral, together with all of Debtor's other property of any kind, both real and personal, held by, assigned to, mortgaged to, or conveyed in favor of SHL, whether prior to or after the Petition Date, will stand as one general, continuing collateral security for all Obligations and may be retained by SHL until all Obligations have been paid and satisfied in full.

The foregoing Liens will be first and prior Liens except for any Permitted Liens which have priority or would have priority by the operation of Law. SHL reserves the right to challenge the priority of any Lien of any other Person. For the avoidance of doubt, SHL's Prepetition Liens and Replacement Liens will be subordinate to the foregoing Liens.

At the request of SHL, Debtors will execute and deliver to SHL documentation satisfactory to SHL evidencing the security interests and Liens and providing for the perfection of such Liens. The automatic stay provisions of Section 362 of the Bankruptcy Code are modified to permit the execution, delivery, and filing of such documentation; provided, however, that no such documentation will be required as a condition to the validity, priority, or perfection of Liens created pursuant to this Agreement, which Liens will be deemed valid and properly perfected upon entry of the Financing Order approving this Agreement. Each Debtor hereby irrevocably makes, constitutes, and appoints SHL (and all other Persons designated by SHL for the purpose) as Debtors' true and lawful agent and attorney in fact to sign Debtors' names on any such agreements, instruments, and documents referred to in this section and to deliver such agreements, instruments, and documents to such Persons as SHL in its sole and absolute discretion may elect. Debtors agree to pay on demand any recording tax, filing fees, or other costs incurred by SHL in connection with recording or filing any documentation requested in this section, provided, that, SHL advances the amount of such recording or filing fee.

6.    <u>Existence and Authority; Enforceability of this Agreement</u>. Debtors are a registered entity duly organized, validly existing, and in good standing under the laws of the State of Delaware and the State of Florida, as applicable. Debtors will maintain their limited

liability existence or registered status (in good standing where appropriate under state law) and remain or become duly qualified or licensed (and in good standing where appropriate under state law) as a foreign limited liability company in each jurisdiction in which the conduct of its businesses requires such qualification or license except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

The execution and performance of this Agreement will not violate the governing document provisions of the Debtors, or violate any laws or result in a default under any contract, agreement, or instrument to which Debtors are a party or by which Debtors or their property is bound, except for such violations or defaults that would not have a Material Adverse Effect. Debtors have the power and authority to enter into and perform this Agreement and the Loan Documents, and to incur the obligations herein and therein provided for, and have taken all corporate or other action necessary to authorize the execution, delivery, and performance of this Agreement and the Loan Documents. Upon the execution of this Agreement and the other Loan Documents by Debtors, this Agreement and the Loan Documents will be valid and binding against Debtors, enforceable against such parties in accordance with the terms thereof.

7.      <u>Termination of Automatic Stay</u>. Any Order entered approving this Agreement will provide that the automatic stay, including specifically, but not limited to, the stay imposed by Section 362 of the Bankruptcy Code, is immediately and absolutely lifted and terminated without the need of further order by Court as to the exercise by SHL of any and all of its rights under the terms of this Agreement.

8.      <u>Books and Records</u>. Debtors will permit SHL at all times during regular business hours to free access, with twenty four (24) hours advance notice, to the Records and similar items of Debtors including, without limitation, its Records, computer software, and other computer stored information, and all plans, specifications, drawings, surveys, and related materials, and computer software, licenses, copyrights, patents, and other intellectual property, for the purpose of using, examining, copying, or reproducing same for the purpose of examining, copying, or reproducing the same. Debtors authorize and requests any and all depositories in which funds of Debtors may be deposited to furnish to SHL statements of account and any other documents reflecting receipts and disbursements and any Person doing business with Debtors is authorized to furnish any information requested by SHL concerning any transaction. SHL may furnish copies of any and all statements, agreements, and financial statements and any information which it now has or may obtain concerning Indemnitors to other Persons or companies during the investigation of claims that may be, or have been, asserted against SHL.

9.      <u>Acceleration; Deposit of Collateral; Remedies</u>. Upon the occurrence of any Event of Default, SHL may, at its option, immediately declare all Obligations to be immediately due and payable, whereupon the same will become forthwith due and payable, without presentment, demand, protest, or any notice of any kind.

Upon the occurrence of any Event of Default, all Collateral held by or assigned to SHL by Debtors may be used by SHL at any time in payment of any Obligations; SHL will have, in addition to the rights and remedies given by the Loan Documents, all those allowed by all applicable Laws, including, but without limitation, the UCC as enacted in any jurisdiction in which any Collateral may be located. After deducting from the Proceeds of sale or other

disposition of the Collateral all expenses, including all expenses for legal services (including allocated costs of in-house counsel), such Proceeds will be applied toward the satisfaction of the Obligations. Any remainder of the Proceeds after satisfaction in full of the Obligations will be distributed as required by applicable Laws.

Notice of any sale or other disposition will be given to Debtors at least ten (10) days before the time of any intended public sale or of the time after which any intended private sale or other disposition of the Collateral is to be made which Debtors hereby agree will be reasonable notice of such sale or other disposition. At any such sale, the Collateral, or portions thereof, to be sold may be sold in one lot as an entirety or in separate lots, as SHL may, in its sole and absolute discretion, determine. Debtors agree to assemble, or to cause to be assembled, at their own expense, the Collateral under its control or ownership at such place or places as SHL will designate. At any such sale or other disposition, SHL may to the extent permissible under applicable Laws, purchase the whole or any part of the Collateral, free from any right of redemption on the part of the Debtors, which right is hereby expressly waived and released.

SHL will not be liable and Debtors agree to make no claim against SHL for decrease in value lost to any Collateral, however caused, other than for willful reckless misconduct or gross negligence. SHL will not be obligated to make any sale of the Collateral if it will determine not to do so, regardless of the fact that notice of sale of the Collateral may have been given. SHL may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by SHL until the sale price is paid by the purchaser or purchasers thereof, but SHL will not incur any liability in case any such purchaser or purchasers will fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice.

As an alternative to exercising the power of sale herein conferred, SHL may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction. The costs, including reasonable legal fees of SHL, will be added to any outstanding indebtedness and paid by Debtors.

Without limiting the generality of any of the rights and remedies conferred upon SHL, SHL may upon the occurrence of an Event of Default, to the full extent permitted by applicable Laws (including without limitation seeking relief from the automatic stay, if applicable):

(a) Enter upon the premises of Debtors, exclude therefrom Debtors, and take immediate possession of the Collateral, either personally or by means of a receiver appointed by a court of competent jurisdiction, using all necessary and lawful self-help to do so;

(b) at SHL's option, use, operate, manage, and control the Collateral in any lawful manner;

(c) collect and receive all rents, income, revenue, earnings, issues, and profits therefrom; and

(d) maintain, repair, renovate, alter, or remove the Collateral as SHL may determine in its discretion.

10.    <u>Authority of SHL to Elect Remedies</u>. Each right, remedy, and power of SHL provided in this Agreement, the Loan Documents, or by law, equity, or statute will be cumulative, and the exercise by SHL of any right, remedy, or power will not preclude SHL's simultaneous or subsequent exercise of any or all other rights, powers, or remedies. The failure or delay by SHL to exercise any right, power, or remedy will not waive any right, power, or remedy. Except as required herein, no notice or demand upon SHL by Debtors will limit or impair SHL's right to take any action under this Agreement or to exercise any right, power, or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

11.    <u>Condition Precedent to Effectiveness of this Agreement</u>. The effectiveness of this Agreement is subject to the condition precedent that SHL will have received on or before the day hereof each of the following, in form and substance satisfactory to SHL and its counsel:

(a) This Agreement and each of the other Loan Documents duly executed by Debtors.

(b) no orders will have been entered by the Bankruptcy Court which SHL reasonably determines are likely to have a Material Adverse Effect;

(c) all of the "first day orders" presented to the Bankruptcy Court at or about the time of the commencement of the Bankruptcy Cases will be satisfactory in form and substance to SHL; and

(d) receipt of a copy of the duly executed Financing Order (an interim order to be followed in due course by a final order) entered by the Bankruptcy Court, in form acceptable to SHL; without limiting the generality of the foregoing, the Financing Order will (i) ratify the Prepetition Obligors' respective obligations under the Prepetition Loan Documents; (ii) authorize Debtors to enter into this Agreement, and all other documents contemplated by this Agreement; (iii) confirms the waivers and releases contained *infra*.; and (iv) provide SHL adequate protection.

SHL may waive compliance with any of the foregoing, with or without notice to Debtors.

12.    <u>Notices</u>. Any notice, request, demand, or other communications required, permitted or otherwise contemplated by this Agreement will be in writing and either delivered personally, sent by regularly scheduled overnight air courier service, or postage prepaid certified United States mail, return receipt requested, to the following addresses:

SHL:                SHL Holdings
                    401 East Las Olas Boulevard, Suite 800

Fort Lauderdale, Florida 33301

With a copy to:      Stearns Weaver Miller
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Attn.: Eric J. Silver, Esq.

Debtors:      It'Sugar LLC

With a copy to:      Meland Budwick, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Attn: Michael S. Budwick, Esq.

13.    <u>Reaffirmation of Validity and Enforceability of the Prepetition Loan Documents</u>. Prepetition Obligors reaffirm each for themselves, as applicable, that the Prepetition Loan Documents are valid and binding obligations of the Prepetition Obligors, that all terms, covenants, conditions, representations, warranties and agreements contained in the Prepetition Loan Documents are hereby ratified and confirmed in all respects. Debtors acknowledge and agree that there are no claims, offsets, or other actions against SHL, and that there are no set-offs, counterclaims or defenses to the payment of the Prepetition Debt. Atlantic City and FLGC reaffirm their obligations under the Guaranty.

14.    <u>Waiver and Release</u>. To the maximum extent permitted by applicable Laws, Debtors:

(a) Waive: (i) protest of all commercial paper at any time held by SHL on which Debtors are in any way liable; and (ii) notice and opportunity to be heard before exercise by SHL of the remedies of self-help, setoff, or of other summary procedures permitted by any applicable Laws or by any agreement with Debtors, and, except where required hereby or by any applicable Laws, notice of any other action taken by SHL;

(b) release SHL, its officers, directors, attorneys, employees, and agents from all claims for loss or damage caused by any act or omission on the part of any of them, except for their willful misconduct or gross negligence;

(c) waive any defense arising by reason of, and agree that the rights of SHL and the Obligations will be absolute and unconditional irrespective of, (i) any disability or other defense of any other Person; (ii) the unenforceability or cessation from any cause whatsoever, other than the indefeasible payment in full, of all Obligations; (iii) the application by Debtors of the Proceeds of any Collateral for purposes other than the purposes represented by Debtors to SHL; (iv) any modification of the Obligations in any form whatsoever, including without limitation the renewal, extension, acceleration, or other changes in the time for payment, or other change in the terms of the Obligations or

any part thereof; and (vi) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any other Person in respect to the Obligations;

(d) waive all claims, direct or indirect, absolute or contingent, against any other borrower, guarantor, endorser, or surety arising from or relating to this Agreement, any of the other Loan Documents, and/or the Obligations. Without limiting the foregoing, each Debtor waives all rights of reimbursement, exoneration, indemnification, and/or contribution from any other borrower, guarantor, endorser, or surety under or relating to this Agreement, any of the other Loan Documents, and or the Obligations. SHL may proceed against any Collateral securing the Obligations and against parties liable therefor in such order as it may elect, and neither Debtors nor, to the extent allowable by law, any creditor of Debtors will be entitled to require SHL to marshal assets. The benefit of any rule of law or equity to the contrary is hereby expressly waived; and

(e) release, waive, discharge, covenant not to sue, acquit, satisfy and forever discharge SHL, its officers, directors, employees, agents and its affiliates and assigns from any and all liability, claims, counterclaims, defenses, actions, causes of action, suits, controversies, agreements, promises and demands whatsoever in law or in equity which the Debtors ever had, now have or may have, or which any personal representative, successor, heir or assign of obligor's hereafter can, shall or may have against lender and yellow leaf, their officers, directors, employees, agents, and their affiliates and assigns, for, upon or by reason of any matter, cause or thing whatsoever including all actions of SHL taken or to be taken in connection with the Prepetition Loan Documents and the Loan Documents. In addition to, and without limiting the generality of the foregoing, and in consideration of SHL's execution of this Agreement, the Debtors each covenant with and warrant unto SHL, and its affiliates and assigns, that there exist no claims, counterclaims, defenses, objections, offsets or claims of offsets against SHL or the obligation of the Debtors to pay the Prepetition Debt and the Advances to SHL when and as they become due and payable.

15.    Further Assurances. The parties will cooperate reasonably with each other and with their respective representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and the parties agree (i) to furnish upon request to each other such further information, (ii) to execute and deliver to each other such other documents, and (iii) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the transactions contemplated hereby

16.    Governing Law and Jurisdiction. This Agreement will be deemed to be a contract under the laws of the State of Florida and for all purposes will be governed by and construed and enforced in accordance with the laws of such State. Unless the jurisdictional prerequisites are not met, the parties hereto irrevocably consent to the exclusive jurisdiction of the United States District Courts of Florida and of all state courts without waiver of right or removal, for the purpose of any litigation concerning this Agreement. No party hereto will object to or contest Florida as the proper venue for any action or proceeding to enforce terms hereof. Notwithstanding the foregoing, all disputes regarding this Agreement involving Debtors arising

during the pendency of the Bankruptcy Cases will be heard and determined by the Bankruptcy Court.

17.     Jury Waiver. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT, OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, ANY OTHER OF THE LOAN DOCUMENTS, OR THE SUBJECT MATTER HEREOF, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR TORT OR OTHERWISE. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED THAT THE PROVISIONS OF THIS SECTION CONSTITUTE A MATERIAL INDUCEMENT UPON WHICH THE OTHER PARTIES HAVE RELIED, ARE RELYING, AND WILL RELY IN ENTERING INTO THIS AGREEMENT. THE PARTIES HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT A WRITTEN EVIDENCE OF THE CONSENT OF SUCH OTHER PARTY TO THE WAIVER OF ITS RIGHTS TO TRIAL BY JURY.

18.     Binding Effect, Assignment, Amendment and Negotiation. This Agreement will inure to the benefit of, and will be binding upon, the respective successors and permitted assigns of the parties hereto. Debtors have no right to assign any of their rights or obligations hereunder without the prior written consent of SHL. This Agreement may be amended only by a writing signed on behalf of each party. This Agreement has been negotiated by the parties and each party has had the benefit of counsel. This Agreement will not be construed against any party.

19.     Severability. The provisions of this Agreement are intended to be severable. If any provision of this Agreement is held invalid or unenforceable in whole or in part in any jurisdiction such provision will, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability of such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction.

20.     Survival. All of the representations and warranties set forth in this Agreement, the other Loan Documents will survive until all Obligations are paid and satisfied in full.

21.     Counterparts. This Agreement may be executed in counterparts (including by means of facsimile or pdf signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same agreement. This Agreement and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission (including .pdf files), will be treated in all manner and respects and for all purposes as an original agreement or instrument and will be considered to have the same binding legal effect as if it were to the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties, except that the failure of

any party to comply with such a request will not render this Agreement invalid or unenforceable. No party hereto or to any such agreement or instrument will raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each party forever waives any such defense.

22.     <u>Section Headings</u>. The section headings in this Agreement are for convenience only and do not limit, define, or construe the contents of the sections.

23.     <u>Seal</u>. This Agreement is intended to take effect as an instrument under seal.

24.     <u>No Contrary Action</u>. Debtors will not apply to the Bankruptcy Court for the authority to take any action that is prohibited by the terms of this Agreement or any of the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents. The parties acknowledge that the foregoing will not preclude the entry of any order of the Bankruptcy Court approving or authorizing an amendment or modification to this Agreement or the other Loan Documents permitted by this Agreement, which order will be acceptable to SHL whose consent is required to approve such amendment or modification.

| SHL HOLDINGS, INC.                          | IT'SUGAR LLC            |
|---------------------------------------------|-------------------------|
| By: _____         | By: _____ |
| Its:   President                            | Its: _____ |
| IT'SUGAR ATLANTIC CITY LLC                  | IT'SUGAR FLGC LLC       |
| By: _____         | By: _____ |
| Its: _____        | Its: _____ |
|                                             | IT'SUGAR FL I, LLC      |
|                                             | By: _____ |
|                                             | Its: _____ |

#8897071 v1

any party to comply with such a request will not render this Agreement invalid or unenforceable. No party hereto or to any such agreement or instrument will raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each party forever waives any such defense.

22. Section Headings. The section headings in this Agreement are for convenience only and do not limit, define, or construe the contents of the sections.

23. Seal. This Agreement is intended to take effect as an instrument under seal.

24. No Contrary Action. Debtors will not apply to the Bankruptcy Court for the authority to take any action that is prohibited by the terms of this Agreement or any of the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents. The parties acknowledge that the foregoing will not preclude the entry of any order of the Bankruptcy Court approving or authorizing an amendment or modification to this Agreement or the other Loan Documents permitted by this Agreement, which order will be acceptable to SHL whose consent is required to approve such amendment or modification.

| SHL HOLDINGS, INC. | IT'SUGAR LLC |
|---|---|
| By: _____ | By: _Anson Gladnikor_ |
| Its: _____ | Its: _CFO_ |
| IT'SUGAR ATLANTIC CITY LLC | IT'SUGAR FLGC LLC |
| By: _Anson Gladnikor_ | By: _Anson Gladnikor_ |
| Its: _CFO_ | Its: _CFO_ |
| | IT'SUGAR FL I, LLC |
| | By: _Anson Gladnikor_ |
| | Its: _CFO_ |

#8897071 v1

# PROMISSORY NOTE

$4,000,000.00                                             Date: October 7, 2020

1.        FOR VALUE RECEIVED, IT'SUGAR LLC, a Delaware limited liability company ("IT'Sugar"), IT'SUGAR ATLANTIC CITY LLC, a Delaware limited liability company ("Atlantic City"), IT'SUGAR FLGC LLC, a Florida limited liability company ("FLGC"), IT'SUGAR FL I, LLC, a Delaware limited liability company ("FLI" and collectively with IT'Sugar, Atlantic City and FLGC, the "Debtors", and each, a "Debtor") unconditionally and jointly and severally promise to pay to the order of SHL Holdings, Inc., a Florida corporation ("SHL") without setoff, the total unpaid principal amount advanced by SHL from time to time to or for the benefit of or at the request of Debtors together with interest thereon according to the terms and conditions as set forth in that certain Loan and Security Agreement dated as of the date hereof, together with all amendments, modifications and extensions thereof (collectively the "Loan Agreement"). This Note is subject to the terms and conditions of the Loan Agreement provided, however, the Loan Agreement is expressly NOT incorporated herein pursuant to Section 201.08(6), Florida Statutes and Rules 12B-4.052(6)(b) and (12)(h), Florida Administrative Code. Capitalized terms used but not defined in this Note shall have the meaning given to them in the Loan Agreement.

2.        The obligations of the Debtors under this Note are joint and several.

3.        Upon default under this Note or the Loan Agreement, SHL shall have the right to pursue all rights and remedies available to SHL at law or in equity including, but not limited to, those set forth in this Note and the Loan Agreement.

4.        Each Debtor agrees to promptly pay, indemnify and hold harmless SHL from all state and federal taxes of any kind and other liabilities with respect to or resulting from the execution or delivery of this Note or advances made pursuant to this Note and/or the Loan Agreement.

5.        This Note shall be construed under the laws of the State of Florida and the laws of the United States as the same may be applicable.

6.

(a)        The principal amount outstanding hereunder shall bear interest at the LIBOR Daily Floating Rate plus 1.50%. The Debtors will pay interest on November 2, 2020, and then on the first Business Day of each month thereafter until payment in full of all principal outstanding under this Note.

(b)      The Debtors will repay all amounts outstanding under this Note in full in cash or otherwise satisfied in a manner agreed to by SHL in its sole discretion on the date (the "Maturity Date") which is the earliest of (a) 365 days from the Petition Date; (b) the effective date of a plan of reorganization or liquidation; (c) the consummation of a sale(s) of all or substantially all of the assets of the Debtors; (d) the occurrence of an Event of Default; and (e) the entry of an order by the Court approving or authorizing any alternative or additional debtor-in-possession financing. Notwithstanding the foregoing, SHL may, in its sole discretion, agree in writing with the Debtors, to a later Maturity Date.

(c)      Notwithstanding anything to the contrary in the Loan Agreement, this Note, or any other Loan Document, if SHL determines (which determination shall be conclusive absent manifest error), that: (i) adequate and reasonable means do not exist for ascertaining the LIBOR Daily Floating Rate for any requested interest period, including, without limitation, because the LIBOR Rate is not available or published on a current basis and such circumstances or unlikely to be temporary or (ii) the supervisor of the administrator of the LIBOR Rate (or the LIBOR Daily Floating Rate) publicly announces that the LIBOR Rate and the LIBOR Daily Floating Rate have been permanently or indefinitely discontinued or that the LIBOR Rate or the LIBOR Daily Floating Rate may no longer be used, then, after such determination by SHL, all references in this Note and in the Loan Agreement to the term "LIBOR Daily Floating Rate" shall be amended to replace the LIBOR Daily Floating Rate with the "Base Rate", and all payments of interest hereunder shall bear interest at the Base Rate plus 1.5%.  For purposes of this Note, the term "Base Rate" means a fluctuating annual rate of interest in effect from time to time that for any day shall be equal to the rate of interest for such day announced publicly by Citibank, N.A. in New York, New York as Citibank, N.A.'s base rate (which the Debtors acknowledge and agree is announced by and used by Citibank, N.A. for reference purposes only and may not represent the lowest or best rate available).

7.      Notwithstanding any other provision contained in this Note, SHL does not intend to charge and Debtors shall not be required to pay any amount of interest or other fees or charges that is in excess of the maximum permitted by applicable law.  Any payment in excess of such maximum shall be refunded to Debtors or credited against principal, at the option of SHL.  It is the express intent hereof that Debtors not pay and SHL not receive, directly or indirectly, interest in excess of that which may be lawfully paid under applicable law including the usury laws in force in the state of Florida.

8.      All parties hereto, whether as makers, endorsers or otherwise, severally waive presentment, demand, protest and notice of dishonor in connection with this Note.

9.      This Note is binding upon the undersigned and their respective successors and assigns, and shall inure to the benefit of SHL and its successors and assigns.  The Note is made under and governed by the laws of the State of Florida without regard to conflict of law principles.

10.      TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT, OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING OUT OF OR

BASED UPON THIS NOTE, THE LOAN AGREEMENT OR ANY OTHER OF THE LOAN DOCUMENTS, OR THE SUBJECT MATTER HEREOF, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR TORT OR OTHERWISE. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED THAT THE PROVISIONS OF THIS SECTION CONSTITUTE A MATERIAL INDUCEMENT UPON WHICH THE OTHER PARTIES HAVE RELIED, ARE RELYING, AND WILL RELY IN ENTERING INTO THIS AGREEMENT. THE PARTIES HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT A WRITTEN EVIDENCE OF THE CONSENT OF SUCH OTHER PARTY TO THE WAIVER OF ITS RIGHTS TO TRIAL BY JURY.

[Signature Page Follows]

IN WITNESS WHEREOF, the Debtors have executed this Note as of the day and year first above written.

| IT'SUGAR LLC |
| --- |
| By: _Anton Gladnikov_ |
| Its: CFO |

| IT'SUGAR FLGC LLC |
| --- |
| By: _Anton Gladnikov_ |
| Its: CFO |

| IT'SUGAR FL I, LLC |
| --- |
| By: _Anton Gladnikov_ |
| Its: CFO |

| IT'SUGAR ATLANTIC CITY LLC |
| --- |
| By: _Anton Gladnikov_ |
| Its: CFO |

## LOAN AND SECURITY AGREEMENT

LOAN AND SECURITY AGREEMENT (this "Amendment"), dated as of September __, 2020, by and among IT'SUGAR LLC, a Delaware limited liability company ("IT'Sugar"), IT'SUGAR ATLANTIC CITY LLC, a Delaware limited liability company ("Atlantic City"), IT'SUGAR FLGC LLC, a Florida limited liability company ("FLGC," and collectively with IT'Sugar and Atlantic City, the "Prepetition Obligors"), IT'SUGAR FL I, LLC, a Delaware limited liability company ("FLI" and collectively with the Prepetition Obligors, the "Debtors") and SHL HOLDINGS, INC., a Florida corporation ("SHL").

R E C I T A L S:

A.      It'Sugar was indebted to Bank of America N.A. ("Bank") as evidenced by that certain Credit Agreement dated August 24, 2018, and First Amendment thereto dated February 28, 2020, by and between It'Sugar and Bank (as so amended, the "Prepetition Credit Agreement"), evidencing a revolving line of credit in the principal amount of $4,000,000.00 (the "Prepetition Line of Credit"), which could be increased to $6,000,000.00 upon the request of It'Sugar.

B.      It'Sugar's obligations under the Prepetition Line of Credit were guaranteed by Atlantic City and FLGC pursuant to the terms of that certain Continuing and Unconditional Guaranty dated August 24, 2018, made by Atlantic City and FLGC in favor of the Bank (the "Guaranty").

C.      The Prepetition Obligors' respective obligations under the Credit Agreement and Guaranty are secured by, among other things, that certain Security Agreement dated August 24, 2018, by and among the Prepetition Obligors and the Bank (the "Prepetition Security Agreement"), granting the Bank a security interest in the personal property assets of the Prepetition Obligors described therein. The Bank's security interest was perfected pursuant to UCC-1 Financing Statements filed (i) with respect to It'Sugar and Atlantic City, with the Delaware Department of State on August 24, 2018 under filing #20185865726, and (ii) with respect to FLGC, with the Florida Secured Transactions Registry on August 24, 2018 under filing #201806304765 (the "LOC UCC-1s").

D.      It'Sugar was also indebted to Banc of America Leasing & Capital, LLC (also, "Bank") as evidenced by that certain Master Loan and Security Agreement No. 45868-70000 dated September 6, 2018, by and between It'Sugar and Bank (the "Prepetition Equipment Loan Agreement"), and that certain Equipment Security Note Number 001 dated September 6, 2018 (the "Prepetition Equipment Note"), executed by It'Sugar and the Bank, and evidencing indebtedness in the original principal amount of $620,074.91 (the "Prepetition Equipment Loan").

E.      It'Sugar's respective obligations under the Prepetition Equipment Loan are secured by the Prepetition Equipment Loan Agreement and the Prepetition Equipment Note, granting the Bank a security interest in certain Equipment (as described and defined in the Prepetition Equipment Loan Agreement and Prepetition Equipment Note). The Bank's security interest was perfected pursuant to a UCC-1 Financing Statement filed with respect to It'Sugar,

with the Delaware Department of State on September 19, 2018 under filing #20186460741 (the "Equipment UCC-1").

F.    ~~D.~~The Prepetition Credit Agreement, the Guaranty, the Prepetition Security Agreement, the LOC UCC-1s and all other written documents executed in connection with the Prepetition Line of Credit, as well as the Prepetition Equipment Loan Agreement, the Prepetition Equipment Note, the Equipment UCC-1, and all other written documents executed in connection with the Prepetition Equipment Loan, together with any and all written renewals, modifications and/or extensions thereof are collectively referred to as the "Prepetition Loan Documents".

G.    ~~E.~~The Bank's rights under the Prepetition Loan Documents were assigned without recourse to the SHL pursuant to a two Loan Sale and Assignment ~~Agreement~~Agreements, dated April 7, 2020, and the other assignment documents and instruments executed in connection with the Assignment, and by reason thereof SHL is now the holder of such Prepetition Loan Documents and has all the rights and obligations of the Bank thereunder.

H.    ~~F.~~The Prepetition Credit Agreement has been amended from time to time, including an increase of the principal balance advanced on the Prepetition Line of Credit to $6,000,000.00.

I.    ~~G.~~As of the Petition Date, the Prepetition Obligors , as applicable, are liable for payment of the Prepetition Debt (defined below) in an amount not less than $6,216,362.00.

J.    ~~H.~~On September 22, 2020, each of the Prepetition Obligors, along with the their affiliate IT'Sugar FL I, LLC ("FL I," collectively with the Prepetition Obligors, the "Debtors") filed petitions for relief under Chapter 11of the Bankruptcy Code in the United States Bankruptcy Court, Southern District of Florida (the "Bankruptcy Court") styled as follows: (1) *In re IT'Sugar FI I, LLC*, Case No. 20-20259-RAM (2) IT'Sugar, LLC, Case No. 20-20261-RAM, (3) IT'Sugar Atlantic City, LLC, Case No. 20-20263-RAM and (4) IT'Sugar FLGC, LLC, Case No. 20-20264-RAM (collectively, the "Bankruptcy Cases").

K.    ~~I.~~The Debtors have requested that SHL extend financing to the Debtors in connection with the Bankruptcy Cases to facilitate its reorganization.

L.    ~~J.~~SHL is willing to make loans and extend credit to the Debtors, subject to the terms and conditions set out herein and subject to the terms and conditions set forth in the Financing Order and any other orders of the Bankruptcy Court approving the proposed financing by SHL.

M.    ~~K.~~The parties desire to enter into this Agreement and to memorialize their agreements with ~~repsect~~ respect to the matters set forth.

A G R E E M E N T:

FOR AND IN CONSIDERATION of the mutual covenants herein and good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtors and SHL agree as follows:

1.    <u>Recitals</u>.  The foregoing recitals are confirmed by the parties as true and correct and are incorporated herein by reference. The recitals are a substantive part of this Agreement. Specifically, the Debtors acknowledge the Prepetition Debt.

2.    <u>Definitions</u>. Unless the context otherwise requires, the following terms when used in this Agreement will have the meanings set forth below:

"Administrative Expense Advance" means the portion of the ~~DIP Facility advance~~ Advances for the payment of (i) fees and expenses incurred by professionals retained by Debtors and the Committee (if any), all up to the amount set forth in the Budget; (ii) fees due to the United States Trustee pursuant to 28 U.S.C. Section 1930(a)(6); and (iii) fees due the Clerk of the Court.

"Administrative Expense Carve Out" means the carve out from SHL's super-priority administrative expense claim in order to allow the Administrative Expense Advance to be used as set forth in the Budget.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Budget" means Debtors' budget attached as "**<u>Exhibit A</u>**".

"Business Day" means any day excluding Saturday, Sunday, and any day which is a legal holiday under the laws of the State of Florida or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

"Collateral" means the following property now owned or hereafter acquired by the Debtors:

(a) All accounts, and all chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto; and all returned or repossessed goods which, on sale or lease, resulted in an account.

(b) All inventory.

(c) All equipment and fixtures now owned or hereafter acquired by the Debtors.

(d) All of the Debtors' deposit accounts wherever located. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

(e) All instruments, chattel paper, documents, certificates of deposit, securities and investment property of every type.

(f) All general intangibles. The Collateral shall include all good will connected with or symbolized by any of such general intangibles.

(g) All negotiable and nonnegotiable documents of title covering any Collateral.

(h) All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(i) All substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the Collateral, and all income, benefits and property receivable on account of the Collateral, and all supporting obligations covering any Collateral.

(j) All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer readable memory and any computer software necessary to process such memory.

"Committee" means any creditors or equity security holders committee appointed in any Chapter 11 case by the U.S. Trustee.

"Debt" means, as of any applicable date of determination and as to any Person, all items of indebtedness, obligation, or liability of such Person, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, that should be classified and presented as a liability on a balance sheet prepared in accordance with GAAP, including without limitation any billings in excess of costs and estimated earnings on Work that has not been completed.

"Event of Default" means any one or more of the following occurring after the date of this Agreement that is determined by SHL to constitute an Event of Default on or after its occurrence:

(a) Debtors have failed or refused to comply with any provisions of the Financing Order or have failed or refused to perform any obligation under this Agreement; or

(b) the occurrence of a default under any document relating to any Debt of Debtors; or the foreclosure or notice of foreclosure by any lender or holder of any Debt of Debtors on any collateral that secures any Debt of Debtors; or

(c) Debtors allow a judgment creditor to obtain possession of any of the Collateral by any means, including, but without limitation, levy, distraint, replevin, or self-help; or

(d) if Debtors violate, breach, or fail to adhere to any of the terms, conditions, or covenants of any of the Loan Documents or the Prepetition Loan Documents; or

(e) if the Bankruptcy Cases are dismissed, suspended, or converted to cases under Chapter 7 of the Bankruptcy Code or a trustee will be appointed in the Bankruptcy Cases; or an application will be filed by Debtors for the approval of, or there will arise, any other claim not contemplated by this Agreement having priority senior to or pari passu with the claims of SHL under this

Agreement or any other claim having priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code; or

(f) if the Bankruptcy Court enters an order (granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder (other than SHL) of any security interest in the Collateral; or

(g) any Person (including any Committee) will successfully prosecute any action, suit, or other proceeding or contested matter challenging the validity, perfection, or priority of any Liens of SHL, or the validity or enforceable of any of the Loan Documents or the Prepetition Loan Documents, or asserting any avoidance claims against SHL or seeking to recover any monetary damages from SHL; or

(h) the determination of Debtors, whether by vote of its managers, members, or otherwise, to suspend the operation of Debtors' business in the ordinary course, liquidate all or substantially all of Debtors' assets, or the filing of a motion or other application in the Bankruptcy Cases, seeking authority to do any of the foregoing; and

(i) this Agreement or any related document will be terminated, revoked, or declared void or unenforceable or challenged by Debtors.

Notwithstanding anything in the Prepetition Loan Documents to the contrary, no Event of Default will be deemed to have occurred as a result of the filing of the Bankruptcy Cases.

"Financing Order" means an interim order and/or a financing order that is entered by the Bankruptcy Court, following proper notice and a hearing thereon, which is in all respects satisfactory to SHL and which, among other things, authorizes the incurrence by Debtors of post-petition secured and super administrative priority Debt as contemplated by this Agreement and affords adequate protection of Liens in favor of SHL.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board.

"Laws" means all ordinances, statutes, rules, regulations, orders, injunctions, writs, or decrees of any government or political subdivision or agency thereof, or any court or similar entity established by any thereof.

"LIBOR Daily Floating Rate" is a fluctuating rate of interest which can change on each Banking Day. The rate will be adjusted on each Banking Day to equal the London Interbank Offered Rate (or a comparable or successor rate which is approved by SHL) for U.S. Dollar deposits for delivery on the date in question for a one month term beginning on that date. SHL will use the London Interbank Offered Rate as published by Bloomberg (or other commercially available

source providing quotations of such rate as selected by the SHL from time to time) as determined at approximately 11:00 a.m. London time two (2) London Banking Days prior to the date in question, as adjusted from time to time in the SHL's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate will be determined by such alternate method as reasonably selected by SHL. A "Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars. If at any time the LIBOR Daily Floating Rate is less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Lien" means any mortgage, security interest, lien, pledge, charge, proxy, voting trust or arrangement, encumbrance, lease, sublease, license, or other rights of use by another or other interest of any character whatsoever.

"Loan Documents" means this Agreement, the promissory note, and any other instruments, agreements or other documents entered into in connection herewith

"Material Adverse Effect" means, relative to any occurrence of whatever nature (including the adverse determination in any litigation, arbitration, or governmental investigation or proceeding), (i) a material adverse effect on the financial condition, business, or business operations of Debtors taken as a whole, or (ii) a material impairment of the ability of Debtors to satisfy its obligations to SHL under the Loan Documents or the Prepetition Loan Documents, or (iii) a material adverse impact on SHL's security interest in the Collateral.

"Obligations" means and includes the punctual payment and performance of parties' obligations under this Agreement and the other Loan Documents, and all loans, advances (including, without limitation, interest payments to prior secured parties, mortgagees, or lienors, or for Taxes, levies, insurance, rent, repairs to, or maintenance or storage of any of the Collateral (provided, however, nothing herein will be construed as a requirement or commitment that SHL will make any advances).

"Permitted Liens" means: (a) Liens of governmental agencies for taxes, assessments, or governmental charges not yet past due or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP; (b) inchoate non perfected mechanics', workmen's, and repairmen's Liens or other like Liens arising by operation of law in the ordinary course of business of Debtor and not past due unless contested in good faith by appropriate proceedings; and (c) Liens on individual specific pieces of equipment that are evidenced by UCC financing statements validly perfected prior to the Petition Date.

"Person" means any entity, whether an individual, trustee, corporation, partner, joint stock company, unincorporated organization, business association or firm, joint venture, a government or any agent or instrumentality or political subdivision thereof.

"Petition Date" means September 22, 2020 (the date on which Debtors filed for bankruptcy pursuant to the Bankruptcy Code).

"Prepetition Debt" means (a) All indebtedness or obligations under the Prepetition Loan Documents as of the Petition Date, including all "Indebtedness" (as defined in the Prepetition

Security Agreement), and "Obligations" (as defined in the Prepetition Equipment Loan Agreement) and all fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Loan Documents, plus (b) all amounts allowable under Section 506(b) of the Bankruptcy Code.

"Prepetition Liens" means SHL's asserted security interests in the Collateral under the Prepetition Loan Documents.

"Proceeds" means whatever is receivable or received when Collateral or proceeds are sold, collected, exchanged, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including returned or rebate of premiums, with respect to any insurance relating thereto.

"Records" means correspondence, memoranda, tapes, books, discs, paper, magnetic storage, and other documents or information of any type, whether expressed in ordinary or machine language.

"Replacement Liens" means SHL's Liens in the Collateral granted pursuant to the Financing Order.

"Tax" means any present or future tax, levy, impost, duty, charge, fee, deduction, or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld, or assessed.

"UCC" means the Uniform Commercial Code as in effect on the date hereof in the State of Florida as it may be amended from time-to-time; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection or priority of a security interest in any Collateral is governed by any state other than Florida, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

3.    DIP Facility. Subject to the terms and conditions of this Agreement and the Financing Order (including SHL's right to cease making loans to the Debtors), and subject to the satisfaction of the conditions precedent contained in this Agreement and the Financing Order, SHL agrees to make loans and advances (each, an "Advance" and collectively, the "Advances") to or on behalf of Debtors in the aggregate principal amount of four million dollars ($4,000,000.00) to the extent required to pay, when due, those expenses enumerated in the Budget. Debtors will execute a promissory note to evidence the advances and loans to be made under this Agreement. Said loans and advances will be repaid to SHL as set forth in this Agreement and in the promissory note. So long as there exists no Event of Default and subject to the terms of this Agreement the Advances shall be made to the Debtors, as appropriate, in the amounts and in accordance with the schedule set forth in the Budget. Interest shall accrue on the outstanding principal amount of each Advance at a rate per annum equal to LIBOR Daily Floating Rate plus one and one-half percent (1.50%). Upon the occurrence of any Event of Default, interest on all amounts not paid when due shall accrue and be payable at a rate per annum equal to the highest rate permitted by applicable law. Any imposition of default interest shall be made retroactive to the date of the occurrence of the applicable Event of Default. All

interest on the Advances will be computed on the basis of the actual number of days elapsed over a 360-day year.

4.    <u>Superpriority Administrative Expense Claim</u>. Advances occurring from and after the Petition Date will constitute a super priority administrative expense in accordance with Sections 507(a)(1) and 503(b) of the Bankruptcy Code, which will have priority and payment over all other administrative expenses and unsecured claims of any kind or nature, whether now or hereafter arising including all administrative expenses of the kind specified in or arising or ordered under Sections 105, 326, 328, 503(b), 506(e), 507 (b), 546(c), and 1114 of the Bankruptcy Code. Notwithstanding the foregoing, the super priority administrative expense claims of SHL will be subordinate to the Administrative Expense Carve Out. Debtors will not incur, create, assume, suffer to exist or permit or make any application or motion for any other super priority claim or Lien which is pari passu with or senior to the claims of SHL under the Loan Documents, other than as expressly contemplated and permitted under this Agreement.

5.    <u>Security Interest</u>. As security for the payment and performance of all Obligations, now existing or hereafter incurred, matured or unmatured, direct or contingent, including all extensions and renewals thereof, Debtors, jointly and severally, hereby assign to SHL and grants to SHL a Lien upon and security interest in the Collateral. The Collateral, together with all of Debtor's other property of any kind, both real and personal, held by, assigned to, mortgaged to, or conveyed in favor of SHL, whether prior to or after the Petition Date, will stand as one general, continuing collateral security for all Obligations and may be retained by SHL until all Obligations have been paid and satisfied in full.

The foregoing Liens will be first and prior Liens except for any Permitted Liens which have priority or would have priority by the operation of Law. SHL reserves the right to challenge the priority of any Lien of any other Person. For the avoidance of doubt, SHL's Prepetition Liens and Replacement Liens will be subordinate to the foregoing Liens.

At the request of SHL, Debtors will execute and deliver to SHL documentation satisfactory to SHL evidencing the security interests and Liens and providing for the perfection of such Liens. The automatic stay provisions of Section 362 of the Bankruptcy Code are modified to permit the execution, delivery, and filing of such documentation; provided, however, that no such documentation will be required as a condition to the validity, priority, or perfection of Liens created pursuant to this Agreement, which Liens will be deemed valid and properly perfected upon entry of the Financing Order approving this Agreement. Each Debtor hereby irrevocably makes, constitutes, and appoints SHL (and all other Persons designated by SHL for the purpose) as Debtors' true and lawful agent and attorney in fact to sign Debtors' names on any such agreements, instruments, and documents referred to in this section and to deliver such agreements, instruments, and documents to such Persons as SHL in its sole and absolute discretion may elect. Debtors agree to pay on demand any recording tax, filing fees, or other costs incurred by SHL in connection with recording or filing any documentation requested in this section, provided, that, SHL advances the amount of such recording or filing fee.

6.    <u>Existence and Authority; Enforceability of this Agreement</u>. Debtors are a registered entity duly organized, validly existing, and in good standing under the laws of the State of Delaware and the State of Florida, as applicable. Debtors will maintain their limited

liability existence or registered status (in good standing where appropriate under state law) and remain or become duly qualified or licensed (and in good standing where appropriate under state law) as a foreign limited liability company in each jurisdiction in which the conduct of its businesses requires such qualification or license except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

The execution and performance of this Agreement will not violate the governing document provisions of the Debtors, or violate any laws or result in a default under any contract, agreement, or instrument to which Debtors are a party or by which Debtors or their property is bound, except for such violations or defaults that would not have a Material Adverse Effect. Debtors have the power and authority to enter into and perform this Agreement and the Loan Documents, and to incur the obligations herein and therein provided for, and have taken all corporate or other action necessary to authorize the execution, delivery, and performance of this Agreement and the Loan Documents. Upon the execution of this Agreement and the other Loan Documents by Debtors, this Agreement and the Loan Documents will be valid and binding against Debtors, enforceable against such parties in accordance with the terms thereof.

7.    <u>Termination of Automatic Stay</u>. Any Order entered approving this Agreement will provide that the automatic stay, including specifically, but not limited to, the stay imposed by Section 362 of the Bankruptcy Code, is immediately and absolutely lifted and terminated without the need of further order by Court as to the exercise by SHL of any and all of its rights under the terms of this Agreement.

8.    <u>Books and Records</u>. Debtors will permit SHL at all times during regular business hours to free access, with twenty four (24) hours advance notice, to the Records and similar items of Debtors including, without limitation, its Records, computer software, and other computer stored information, and all plans, specifications, drawings, surveys, and related materials, and computer software, licenses, copyrights, patents, and other intellectual property, for the purpose of using, examining, copying, or reproducing same for the purpose of examining, copying, or reproducing the same. Debtors authorize and requests any and all depositories in which funds of Debtors may be deposited to furnish to SHL statements of account and any other documents reflecting receipts and disbursements and any Person doing business with Debtors is authorized to furnish any information requested by SHL concerning any transaction. SHL may furnish copies of any and all statements, agreements, and financial statements and any information which it now has or may obtain concerning Indemnitors to other Persons or companies during the investigation of claims that may be, or have been, asserted against SHL.

9.    <u>Acceleration; Deposit of Collateral; Remedies</u>. Upon the occurrence of any Event of Default, SHL may, at its option, immediately declare all Obligations to be immediately due and payable, whereupon the same will become forthwith due and payable, without presentment, demand, protest, or any notice of any kind.

Upon the occurrence of any Event of Default, all Collateral held by or assigned to SHL by Debtors may be used by SHL at any time in payment of any Obligations; SHL will have, in addition to the rights and remedies given by the Loan Documents, all those allowed by all applicable Laws, including, but without limitation, the UCC as enacted in any jurisdiction in which any Collateral may be located. After deducting from the Proceeds of sale or other

disposition of the Collateral all expenses, including all expenses for legal services (including allocated costs of in-house counsel), such Proceeds will be applied toward the satisfaction of the Obligations. Any remainder of the Proceeds after satisfaction in full of the Obligations will be distributed as required by applicable Laws.

Notice of any sale or other disposition will be given to Debtors at least ten (10) days before the time of any intended public sale or of the time after which any intended private sale or other disposition of the Collateral is to be made which Debtors hereby agree will be reasonable notice of such sale or other disposition. At any such sale, the Collateral, or portions thereof, to be sold may be sold in one lot as an entirety or in separate lots, as SHL may, in its sole and absolute discretion, determine. Debtors agree to assemble, or to cause to be assembled, at their own expense, the Collateral under its control or ownership at such place or places as SHL will designate. At any such sale or other disposition, SHL may to the extent permissible under applicable Laws, purchase the whole or any part of the Collateral, free from any right of redemption on the part of the Debtors, which right is hereby expressly waived and released.

SHL will not be liable and Debtors agree to make no claim against SHL for decrease in value lost to any Collateral, however caused, other than for willful reckless misconduct or gross negligence. SHL will not be obligated to make any sale of the Collateral if it will determine not to do so, regardless of the fact that notice of sale of the Collateral may have been given. SHL may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by SHL until the sale price is paid by the purchaser or purchasers thereof, but SHL will not incur any liability in case any such purchaser or purchasers will fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice.

As an alternative to exercising the power of sale herein conferred, SHL may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction. The costs, including reasonable legal fees of SHL, will be added to any outstanding indebtedness and paid by Debtors.

Without limiting the generality of any of the rights and remedies conferred upon SHL, SHL may upon the occurrence of an Event of Default, to the full extent permitted by applicable Laws (including without limitation seeking relief from the automatic stay, if applicable):

(a) Enter upon the premises of Debtors, exclude therefrom Debtors, and take immediate possession of the Collateral, either personally or by means of a receiver appointed by a court of competent jurisdiction, using all necessary and lawful self-help to do so;

(b) at SHL's option, use, operate, manage, and control the Collateral in any lawful manner;

(c) collect and receive all rents, income, revenue, earnings, issues, and profits therefrom; and

(d) maintain, repair, renovate, alter, or remove the Collateral as SHL may determine in its discretion.

10.    <u>Authority of SHL to Elect Remedies</u>. Each right, remedy, and power of SHL provided in this Agreement, the Loan Documents, or by law, equity, or statute will be cumulative, and the exercise by SHL of any right, remedy, or power will not preclude SHL's simultaneous or subsequent exercise of any or all other rights, powers, or remedies. The failure or delay by SHL to exercise any right, power, or remedy will not waive any right, power, or remedy. Except as required herein, no notice or demand upon SHL by Debtors will limit or impair SHL's right to take any action under this Agreement or to exercise any right, power, or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

11.    <u>Condition Precedent to Effectiveness of this Agreement</u>. The effectiveness of this Agreement is subject to the condition precedent that SHL will have received on or before the day hereof each of the following, in form and substance satisfactory to SHL and its counsel:

(a) This Agreement and each of the other Loan Documents duly executed by Debtors.

(b) no orders will have been entered by the Bankruptcy Court which SHL reasonably determines are likely to have a Material Adverse Effect;

(c) all of the "first day orders" presented to the Bankruptcy Court at or about the time of the commencement of the Bankruptcy Cases will be satisfactory in form and substance to SHL; and

(d) receipt of a copy of the duly executed Financing Order (an interim order to be followed in due course by a final order) entered by the Bankruptcy Court, in form acceptable to ~~SHL;~~SHL; without limiting the generality of the foregoing, the Financing Order will (i) ratify the Prepetition Obligors' respective obligations under the Prepetition Loan Documents; (ii) authorize Debtors to enter into this Agreement, and all other documents contemplated by this Agreement; (iii) confirms the waivers and releases contained *infra*.; and (iv) provide SHL adequate protection.

SHL may waive compliance with any of the foregoing, with or without notice to Debtors.

12.    <u>Notices</u>. Any notice, request, demand, or other communications required, permitted or otherwise contemplated by this Agreement will be in writing and either delivered personally, sent by regularly scheduled overnight air courier service, or postage prepaid certified United States mail, return receipt requested, to the following addresses:

SHL:                    SHL Holdings
                        401 East Las Olas Boulevard, Suite 800

Fort Lauderdale, Florida 33301

With a copy to:     Stearns Weaver Miller
                   150 West Flagler Street, Suite 2200
                   Miami, Florida 33130
                   Attn.: Eric J. Silver, Esq.

Debtors:             It'Sugar LLC

With a copy to:     Meland Budwick, P.A.
                   3200 Southeast Financial Center
                   200 South Biscayne Boulevard
                   Miami, Florida 33131
                   Attn: Michael S. Budwick, Esq.

13.    <u>Reaffirmation of Validity and Enforceability of the Prepetition Loan Documents</u>. Prepetition Obligors reaffirm each for themselves , as applicable, that the Prepetition Loan Documents are valid and binding obligations of the Prepetition Obligors, that all terms, covenants, conditions, representations, warranties and agreements contained in the Prepetition Loan Documents are hereby ratified and confirmed in all respects. Debtors acknowledge and agree that there are no claims, offsets, or other actions against SHL, and that there are no set-offs, counterclaims or defenses to the payment of the Prepetition Debt. Atlantic City and FLGC reaffirm their obligations under the Guaranty.

14.    <u>Waiver and Release</u>. To the maximum extent permitted by applicable Laws, Debtors:

(a) Waive: (i) protest of all commercial paper at any time held by SHL on which Debtors are in any way liable; and (ii) notice and opportunity to be heard before exercise by SHL of the remedies of self-help, setoff, or of other summary procedures permitted by any applicable Laws or by any agreement with Debtors, and, except where required hereby or by any applicable Laws, notice of any other action taken by SHL;

(b) release SHL, its officers, directors, attorneys, employees, and agents from all claims for loss or damage caused by any act or omission on the part of any of them, except for their willful misconduct or gross negligence;

(c) waive any defense arising by reason of, and agree that the rights of SHL and the Obligations will be absolute and unconditional irrespective of, (i) any disability or other defense of any other Person; (ii) the unenforceability or cessation from any cause whatsoever, other than the indefeasible payment in full, of all Obligations; (iii) the application by Debtors of the Proceeds of any Collateral for purposes other than the purposes represented by Debtors to SHL; (iv) any modification of the Obligations in any form whatsoever, including without limitation the renewal, extension, acceleration, or other changes in the time for payment, or other change in the terms of the Obligations or

any part thereof; and (vi) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any other Person in respect to the Obligations;

(d) waive all claims, direct or indirect, absolute or contingent, against any other borrower, guarantor, endorser, or surety arising from or relating to this Agreement, any of the other Loan Documents, and/or the Obligations. Without limiting the foregoing, each Debtor waives all rights of reimbursement, exoneration, indemnification, and/or contribution from any other borrower, guarantor, endorser, or surety under or relating to this Agreement, any of the other Loan Documents, and or the Obligations. SHL may proceed against any Collateral securing the Obligations and against parties liable therefor in such order as it may elect, and neither Debtors nor, to the extent allowable by law, any creditor of Debtors will be entitled to require SHL to marshal assets. The benefit of any rule of law or equity to the contrary is hereby expressly waived; and

(e) release, waive, discharge, covenant not to sue, acquit, satisfy and forever discharge SHL, its officers, directors, employees, agents and its affiliates and assigns from any and all liability, claims, counterclaims, defenses, actions, causes of action, suits, controversies, agreements, promises and demands whatsoever in law or in equity which the Debtors ever had, now have or may have, or which any personal representative, successor, heir or assign of obligor's hereafter can, shall or may have against lender and yellow leaf, their officers, directors, employees, agents, and their affiliates and assigns, for, upon or by reason of any matter, cause or thing whatsoever including all actions of SHL taken or to be taken in connection with the Prepetition Loan Documents and the Loan Documents. In addition to, and without limiting the generality of the foregoing, and in consideration of SHL's execution of this Agreement, the Debtors each covenant with and warrant unto SHL, and its affiliates and assigns, that there exist no claims, counterclaims, defenses, objections, offsets or claims of offsets against SHL or the obligation of the Debtors to pay the Prepetition Debt and the ~~DIP Loan~~ Advances to SHL when and as they become due and payable.~~.~~

15. <u>Further Assurances</u>. The parties will cooperate reasonably with each other and with their respective representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and the parties agree (i) to furnish upon request to each other such further information, (ii) to execute and deliver to each other such other documents, and (iii) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the transactions contemplated hereby

16. <u>Governing Law and Jurisdiction</u>. This Agreement will be deemed to be a contract under the laws of the State of Florida and for all purposes will be governed by and construed and enforced in accordance with the laws of such State. Unless the jurisdictional prerequisites are not met, the parties hereto irrevocably consent to the exclusive jurisdiction of the United States District Courts of Florida and of all state courts without waiver of right or removal, for the purpose of any litigation concerning this Agreement. No party hereto will object to or contest Florida as the proper venue for any action or proceeding to enforce terms hereof. Notwithstanding the foregoing, all disputes regarding this Agreement involving Debtors arising

during the pendency of the Bankruptcy Cases will be heard and determined by the Bankruptcy Court.

17.    Jury Waiver. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT, OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, ANY OTHER OF THE LOAN DOCUMENTS, OR THE SUBJECT MATTER HEREOF, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR TORT OR OTHERWISE. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED THAT THE PROVISIONS OF THIS SECTION CONSTITUTE A MATERIAL INDUCEMENT UPON WHICH THE OTHER PARTIES HAVE RELIED, ARE RELYING, AND WILL RELY IN ENTERING INTO THIS AGREEMENT. THE PARTIES HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT A WRITTEN EVIDENCE OF THE CONSENT OF SUCH OTHER PARTY TO THE WAIVER OF ITS RIGHTS TO TRIAL BY JURY.

18.    Binding Effect, Assignment, Amendment and Negotiation. This Agreement will inure to the benefit of, and will be binding upon, the respective successors and permitted assigns of the parties hereto. Debtors have no right to assign any of their rights or obligations hereunder without the prior written consent of SHL. This Agreement may be amended only by a writing signed on behalf of each party. This Agreement has been negotiated by the parties and each party has had the benefit of counsel. This Agreement will not be construed against any party.

19.    Severability. The provisions of this Agreement are intended to be severable. If any provision of this Agreement is held invalid or unenforceable in whole or in part in any jurisdiction such provision will, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability of such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction.

20.    Survival. All of the representations and warranties set forth in this Agreement, the other Loan Documents will survive until all Obligations are paid and satisfied in full.

21.    Counterparts. This Agreement may be executed in counterparts (including by means of facsimile or pdf signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same agreement. This Agreement and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission (including .pdf files), will be treated in all manner and respects and for all purposes as an original agreement or instrument and will be considered to have the same binding legal effect as if it were to the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties, except that the failure of

any party to comply with such a request will not render this Agreement invalid or unenforceable. No party hereto or to any such agreement or instrument will raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each party forever waives any such defense.

22.    <u>Section Headings</u>. The section headings in this Agreement are for convenience only and do not limit, define, or construe the contents of the sections.

23.    <u>Seal</u>. This Agreement is intended to take effect as an instrument under seal.

24.    <u>No Contrary Action</u>. Debtors will not apply to the Bankruptcy Court for the authority to take any action that is prohibited by the terms of this Agreement or any of the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents. The parties acknowledge that the foregoing will not preclude the entry of any order of the Bankruptcy Court approving or authorizing an amendment or modification to this Agreement or the other Loan Documents permitted by this Agreement, which order will be acceptable to SHL whose consent is required to approve such amendment or modification.

| SHL HOLDINGS, INC. | IT'SUGAR LLC |
|---|---|
| By: _____ | By: _____ |
| Its: _____ | Its: _____ |
| IT'SUGAR ATLANTIC CITY LLC | IT'SUGAR FLGC LLC |
| By: _____ | By: _____ |
| Its: _____ | Its: _____ |
|  | IT'SUGAR FL I, LLC |
|  | By: _____ |
|  | Its: _____ |

**It'sugar**
**13 Week Cash Budget**
**Original vs. Proposed Revision**

| 13 Week Period | Original 13 Week Budget | Proposed Revised Budget | Change Incr (Decr) | Reason |
|---|---|---|---|---|
| **Receipts:** | | | | |
| Projected Store Sales | $ 11,289,741 | 11,289,741 | - | |
| Projected Wholesale Sales | 235,592 | 235,592 | - | |
| Projected e-commerce & Partnering | 1,225,036 | 1,225,036 | - | |
| Projected New Temp Store Sales | 583,811 | 583,811 | - | |
| Sales Tax Collected | 564,487 | 564,487 | - | |
| DIP Financing | 4,000,000 | 4,000,000 | - | |
| **Total Receipts** | **$ 17,898,666** | **17,898,666** | **-** | **No Change** |
| | | | | |
| **Disbursements:** | | | | |
| Sales Taxes Paid | $ (525,010) | $ (625,010) | $ 100,000 | revised estimate |
| Inventory Purchases | (5,001,041) | (5,797,305) | 796,264 | Fewer Rejected stores. Projecting higher sales. |
| Store Payroll | (2,935,408) | (2,935,408) | - | |
| Corporate Payroll | (1,263,740) | (1,263,740) | - | |
| Severances | (64,369) | - | (64,369) | revised estimate |
| Shared Services Allocation | (105,000) | (105,000) | - | |
| Store Controllables | (566,735) | (608,028) | 41,293 | revised estimate |
| Corporate Controllables | (413,387) | (436,463) | 23,076 | |
| Capex Funding - Temp Stores | (1,248,198) | (1,248,198) | | |
| Occupancy (1) | (4,940,685) | (4,290,685) | (650,000) | Successfully negotiated rent modifications |
| Debt Service SHL Credit Facility | - | (23,986) | 23,986 | Added to budget |
| Debt Service SHL Equipment Loan | - | (55,547) | 55,547 | Added to budget |
| SHL - DIP interest | - | (7,203) | 7,203 | Added to budget |
| **Subtotal Operating Costs** | **$ (17,063,573)** | **$ (17,396,573)** | **$ 333,000** | |
| | | | | |
| **Filing Fees & Expenses:** | | | | |
| Legal - M&B | (160,000) | (45,000) | (115,000) | Applying retainer. Revised timing of payment. |
| US Trustee | (4,750) | (4,750) | - | |
| Financial Advisor - Algon | (240,000) | (22,000) | (218,000) | Applying retainer. Revised timing of payment. |
| Creditor's Committee Counsel (2) | (16,000) | (16,000) | - | |
| | - | - | - | |
| **Subtotal Filing Fees** | **$ (420,750)** | **$ (87,750)** | **$ (333,000)** | |
| | | | | |
| **Total Disbursements** | **$ (17,484,323)** | **$ (17,484,323)** | **$ 0** | **No Change** |
| | | | | |
| **Operating Cash Recap** | | | | |
| **Beginning Cash Balance** | $ 500,000 | $ 622,485 | $ 122,485 | Adjusted beginning balance to actual |
| | | | | |
| **Change in Cash** | 414,344 | 414,344 | - | **No Change** |
| | | | | |
| **Cash Balance - End of 13th Week** | **$ 914,344** | **$ 1,036,829** | **$ 122,485** | Adjusted beginning balance to actual |

EXHIBIT C

**It'sugar**
**Proposed Revised 13 Week Budget**

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Sep | Oct | Oct | Oct | Oct | Nov | Nov | Nov | Nov | Dec | Dec | Dec | Dec | Total |
|  | Week 5 | Week 1 | Week 2 | Week 3 | Week 4 | Week 1 | Week 2 | Week 3 | Week 4 | Week 1 | Week 2 | Week 3 | Week 4 | Revised |
| Week ended | 9/26/20 | 10/3/20 | 10/10/20 | 10/17/20 | 10/24/20 | 10/31/20 | 11/7/20 | 11/14/20 | 11/21/20 | 11/28/20 | 12/5/20 | 12/12/20 | 12/19/20 |  |
| **Receipts:** | | | | | | | | | | | | | | |
| Projected Sales | $ 413,577 | $ 963,252 | $ 963,252 | $ 963,252 | $ 963,252 | $ 1,030,810 | $ 1,030,810 | $ 1,030,810 | $ 1,030,810 | $ 1,192,168 | $ 1,192,168 | $ 1,192,168 | $ 1,367,850 | $ 13,334,179 |
| Sales Tax Collected | 18,873 | 43,537 | 43,537 | 43,537 | 43,537 | 40,533 | 40,533 | 40,533 | 40,533 | 50,442 | 50,442 | 50,442 | 58,008 | 564,487 |
| DIP Financing | 2,000,000 | | | | | 2,000,000 | | | | | | | | 4,000,000 |
| **Total Receipts** | $ 432,450 | $ 3,006,789 | $ 1,006,789 | $ 1,006,789 | $ 1,006,789 | $ 3,071,344 | $ 1,071,344 | $ 1,071,344 | $ 1,071,344 | $ 1,242,609 | $ 1,242,609 | $ 1,242,609 | $ 1,425,858 | $ 17,898,666 |
| **Disbursements:** | | | | | | | | | | | | | | |
| Sales Taxes Paid | $ - | $ - | $ - | $ - | $ (288,728) | $ - | - | - | $ (174,148) | $ - | $ - | - | $ (162,133) | $ (625,010) |
| Inventory Purchases | - | (342,529) | (342,529) | (342,529) | (342,529) | (935,856) | (919,556) | (489,354) | (489,354) | (414,113) | (387,761) | (295,598) | (495,596) | (5,797,305) |
| Store Payroll | - | (451,391) | - | (451,391) | - | (495,656) | - | (520,656) | - | (520,656) | - | (495,656) | - | (2,935,408) |
| Corporate Payroll | - | (185,623) | - | (185,623) | - | (210,623) | - | (235,623) | - | (235,623) | - | (210,623) | - | (1,263,740) |
| Shared Services Allocation | - | - | (35,000) | - | - | (35,000) | - | (35,000) | - | - | (35,000) | - | - | (105,000) |
| Corporate & Store Controllables | - | (74,629) | (74,629) | (74,629) | (74,629) | (92,124) | (94,474) | (99,816) | (79,143) | (98,951) | (91,259) | (98,951) | (91,259) | (1,044,491) |
| Capex Funding - Temp Stores | - | - | - | - | (50,000) | (203,525) | (253,525) | (253,525) | (253,525) | (117,049) | (117,049) | - | - | (1,248,198) |
| Occupancy (1) | - | - | - | (1,317,727) | - | - | (1,376,058) | - | - | - | (1,596,900) | - | - | (4,290,685) |
| Debt Service SHL Credit Facility | - | - | - | - | - | (16,080) | - | - | - | - | (7,906) | - | - | (23,986) |
| Debt Service SHL Equipment Loan | - | - | - | - | - | - | - | (37,031) | - | - | - | - | (18,516) | (55,547) |
| SHL - DIP interest | - | - | - | - | - | (1,933) | - | - | - | - | (5,271) | - | - | (7,203) |
| **Subtotal Operating Costs** | $ - | $ (1,054,173) | $ (452,158) | $ (2,371,900) | $ (755,887) | $ (1,955,797) | $ (2,678,613) | $ (1,636,005) | $ (996,170) | $ (1,386,393) | $ (2,241,146) | $ (1,100,829) | $ (767,504) | $ (17,396,573) |
| **Filing Fees & Expenses:** | | | | | | | | | | | | | | |
| Legal - M&B | | | | | | - | | | | (45,000) | | | | (45,000) |
| US Trustee | | | | $ (4,750) | | | | | | | | | | (4,750) |
| Financial Advisor - Algon | | | | | | - | | | | $ (22,000) | | | | (22,000) |
| Creditor's Committee Counsel (2) | | | | | | | | | | (16,000) | | | | (16,000) |
| **Subtotal Filing Fees** | $ - | $ - | $ - | (4,750) | $ - | $ - | $ - | $ - | $ - | $ (83,000) | $ - | $ - | $ - | (87,750) |
| **Total Disbursements** | $ - | $ (1,054,173) | $ (452,158) | $ (2,376,649) | $ (755,887) | $ (1,955,797) | $ (2,678,613) | $ (1,636,005) | $ (996,170) | $ (1,469,393) | $ (2,241,146) | $ (1,100,829) | $ (767,504) | $ (17,484,323) |
| **Operating Cash Recap** | 9/26/20 | 10/3/20 | 10/10/20 | 10/17/20 | 10/24/20 | 10/31/20 | 11/7/20 | 11/14/20 | 11/21/20 | 11/28/20 | 12/5/20 | 12/12/20 | 12/19/20 | |
| **Beginning Cash Balance** | $ 622,485 | $ 1,054,935 | $ 3,007,551 | $ 3,562,182 | $ 2,192,321 | $ 2,443,223 | $ 3,558,770 | $ 1,951,501 | $ 1,386,840 | $ 1,462,013 | $ 1,235,230 | $ 236,694 | $ 378,474 | $ 622,485 |
| **Change in Cash** | $ 432,450 | $ 1,952,616 | $ 554,631 | $ (1,369,861) | $ 250,902 | $ 1,115,547 | $ (1,607,269) | $ (564,662) | $ 75,174 | $ (226,783) | $ (998,537) | $ 141,781 | $ 658,354 | $ 414,344 |
| **Cash Balance - End of Week** | $ 1,054,935 | $ 3,007,551 | $ 3,562,182 | $ 2,192,321 | $ 2,443,223 | $ 3,558,770 | $ 1,951,501 | $ 1,386,840 | $ 1,462,013 | $ 1,235,230 | $ 236,694 | $ 378,474 | $ 1,036,829 | $ 1,036,829 |

(1) Occupancy payments are subject to rejections and modifications of leases.

(2) To be determined, if applicable.